UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

UNITED STATES OF AMERICA,

     -against-                                   22-Cr-330 (KMK)

ERIC BOLTON,                             Hon. Kenneth M. Karas, U.S.D.C.J.

                    Defendant.

------------------------------------------------------------X


## SENTENCING
## MEMORANDUM OF LAW

Stephen R. Lewis, Esq.
Stephens, Baroni, Reilly & Lewis, LLP
*Attorneys for Defendant, Eric Bolton*
175 Main Street, Suite 800
White Plains, NY 10601
914-683-5185
slewis@sbrllaw.com

## Table of Contents

Table of Authorities.................................................................................................. ii

Preliminary Statement............................................................................................. 1

1. 18 U.S.C. 922(g)(1) is Unconstitutional as Applied to Mr. Bolton................................ 2

2. A. The ACCA Enhancement is Not Applicable................................................... 5

2. B. Career Offender Guideline Calculation is Not Applicable........................................ 6

2. C. The Guideline Enhancement Under USSG § 2K2.1(a)4(A) Should Not Apply.......... 10

2. D. The Defendant Challenges the Probation Report's Calculation of His
Criminal History.................................................................................... 11

3. The Defendant's Incarceration............................................................... 13

4. Personal History and Circumstances................................................................ 15

5. Instant Offense Circumstances....................................................................... 16

6. § 3553 Factors:

1. The Nature and Circumstances of the Offense and the History
and Characteristics of the defendant

a. The Offense............................................................................ 17

1. b. The History and Characteristics of the Defendant............................................ 17

2. a. The Need for the Sentence Imposed: To Reflect the Seriousness of
the Offense, to Provide Respect for the Law, and to Provide Just
Punishment for the Offense.............................................................. 18

2. b. To Afford Deterrence to Criminal Conduct; Protect the Public and
Provide the Defendant with Training and Education in the Most
Effective Manner..................................................................... 18

3. and 4. The Kind of Sentence and the Sentencing Range Established................... 19

Conclusion.................................................................................................. 19

## Table of Authorities

<u>Cases</u>

*Binderup v. A.G. United States,*
 836 F.3d 336 (3d Cir. 2016) (*en banc*)...................................................... 3, 4

*District of Columbia v. Heller,*
 554 U.S. 570 (2008)........................................................................ 2

*Kisor v. Wilkie,*
 139 S.Ct. 2400 (2019)...................................................................... 11

*N.Y. State Rifle & Pistol Assn. v. Bruen,*
 142 S.Ct. 2111 (2022)............................................................... 2, 3, 4, 14

*Range v. A.G. United States,*
 2023 U.S.App. LEXIS 13972 (3d Cir. June 6, 2023) (*en banc*)............................. 4

*United States v. Bogle,*
 717 F.3d 281 (2d Cir. 2013)............................................................... 2

*United States v. Boyce,*
 2022 U.S. Dist. LEXIS 107096.............................................................. 6

*United States v. Bullock,*
 18-Cr-00165 (CWR) (M.S.S.D. June 28, 2023)............................................... 4

*United States v. Campbell,*
 22 F.4th 438 (4th Cir. 2022).............................................................. 10

*United States v. Castillo,*
 2023 U.S. App. LEXIS 13373 (9th Cir. 2023)............................................... 11

*United States v. Dupree,*
 57 F.4th 1269 (11th Cir. 2023) (*en banc*)............................................... 10

*United States v. Fernandes-Taveras,*
 511 F.Supp.3d 367 (E.D.N.Y. 2021)......................................................... 9

*United States v. Gibson,*
 55 F.4th 153 (2d Cir. 2022)............................................................... 8

*United States v. Gibson,*
 60 F.4th 720 (2d Cir. 2023)............................................................... 8, 9

*United States v. Hampton*,
　　2023 U.S. Dist. LEXIS 100704, \*34 (S.D.N.Y. June 9, 2023)............................... 3, 4

*United States v. Havis*,
　　927 F.3d 382 (6th Cir. 2019) (*en banc*).................................................................. 10

*United States v. Maiuzzo*,
　　22-Cr-313, Doc. No. 15, Hon. Kenneth Karas (S.D.N.Y. Nov. 30, 2022)............... 10

*United States v. McRae*,
　　2021 U.S. Dist. LEXIS 8777 (S.D.N.Y. Jan. 15, 2021)......................................... 14

*United States v. Minter*,
　　20-Cr-389 (S.D.N.Y. 2021)................................................................................ 5, 6

*United States v. Minter*,
　　21-3102, United States Court of Appeals for the Second Circuit........................... 6

*United States v. Monroe*,
　　2022 U.S.App. LEXIS 14446 (4th Cir. 2022)...................................................... 10

*United States v. Pena*,
　　2021 U.S. Dist. LEXIS 21669 (S.D.N.Y. Feb. 4, 2021)........................................ 14

*United States v. Pimentel*,
　　932 F.2d 1029 (2d Cir. 1991)................................................................................. 1

*United States v. Richardson*,
　　958 F.3d 151 (2d Cir. 2020)................................................................................. 11

*United States v. Rowson,*
　　2023 U.S. Dist. LEXIS 13832, \*39, n. 12 (S.D.N.Y. Jan. 26, 2023)...................... 3

*United States v. Swinton*,
　　495 F.Supp.3d 197 (W.D.N.Y. 2020)................................................................. 7, 8

*United States v. Tabb*,
　　949 F.3d 81 (2d Cir. 2020).................................................................................. 11

*United States v. Townsend*,
　　897 F.3d 66 (2d Cir. 2018).................................................................................... 7

*United States v. Winstead*,
　　890 F.3d 1082 (D.C. Cir. 2018)........................................................................... 10

*United States v. Wynn* (Amended Summary Order),
    845 Fed. App'x. 63 (2d Cir. 2021)........................................................................... 11


<u>Statutes</u>

N.Y. Penal Law § 220.39(1)........................................................................... 5, 6, 7, 8

18 U.S.C. 922(g)(1)........................................................................... passim

18 U.S.C. 924(e)........................................................................... 1, 2, 5

21 U.S.C. §§ 801-971........................................................................... 8


<u>Other Authorities</u>

United States Constitution, Amendment II........................................................................... 2, 3, 4, 5

United States Sentencing Guidelines § 2K2.1(a)(4)(A)........................................................................... 2, 10

United States Sentencing Guidelines § 2K2.1(a)(6)........................................................................... 2

United States Sentencing Guidelines § 4A1.1(d)........................................................................... 12

United States Sentencing Guidelines § 4A1.1(e)........................................................................... 13

United States Sentencing Guidelines § 4B1.1........................................................................... 2, 7

United States Sentencing Guidelines § 4B1.1(a)(2)........................................................................... 7

United States Sentencing Guidelines § 4B1.2........................................................................... 7

United States Sentencing Guidelines § 4B1.2(b)........................................................................... 10, 11, 12

**<u>Preliminary Statement</u>**

Eric Bolton is 33 years old and is before you for sentencing on a one count indictment charging him with 18 U.S.C. § 922(g)(1) (Felon in Possession). Mr. Bolton has an extensive criminal record that he accumulated from ages fifteen to twenty-five which according to the Final Presentence Investigation Report dated June 29, 2023 (Document # 23) (hereinafter "PSR") calculates to a criminal history category of V. PSR pp. 7-10, ¶¶ 28-38.

On March 22, 2023 he appeared before Magistrate Judge McCarthy and pleaded guilty to the one charged count. There is no plea agreement but as per the suggested procedure followed under *United States v. Pimentel*, 932 F.2d 1029 (2d Cir. 1991), the government has submitted a letter dated December 14, 2022 ("Pimentel letter") setting forth that Mr. Bolton's prior drug convictions subject him to sentencing under the Armed Career Criminal Act 18 U.S.C. 924(e) and a mandatory minimum term of fifteen years and a maximum term of supervised release of five years.[1]

The Probation Department has rejected the government's ACCA analysis and has determined his guideline math to be a BOL of 17 with a criminal history of V yielding a 46 to 57 month guideline range incarceration. PSR pp. 6-10, 26-27, ¶¶ 17-38. They recommend a sentence of 46 Months of incarceration followed by three additional years of supervised release. PSR pp. 26, 28.

For the factual reasons and applicable precedents outlined herein, Mr. Bolton's prior

---

[1] In their Pimentel letter at page three they recognize at footnote #1 that if the Court rejects their ACCA analysis, then his maximum period of incarceration would be ten years with a maximum period of supervised release of three years and his guideline BOL level after credit for his acceptance of responsibility would be 17 with a criminal history level V with an applicable guideline range of 46 - 57 months of imprisonment. As addressed later in this Memorandum, Mr. Bolton believes that his net base offense level should be 12 (14 - 2), with a criminal history of IV and his applicable guideline range 21 - 27 months of incarceration.

criminal history does not qualify him as an armed career criminal within the meaning of 18 U.S.C. § 924(e) (ACCA), a career offender under the Federal Sentencing Guidelines Manual currently in effect "USSG §4B1.1 or the guideline base offense enhancement of six points (from 14 to 20) under USSG § 2K2.1(a)(4)(A) and (6).

Additionally, Mr. Bolton believes probation's calculation of his criminal history category is flawed as he should be a category IV with 9 criminal history points all yielding a guideline calculation of a BOL 12, a criminal history category of IV and an imprisonment range of 21-27 months.

Finally, based upon the Supreme Court's decision in *N.Y. State Rifle & Pistol Assn. v. Bruen*, 142 S.Ct. 2111 (2022), the instant statute, 18 U.S.C. 922(g)(1), for which Mr. Bolton stands convicted upon his plea, is believed to be unconstitutional. Mr. Bolton requests his conviction be vacated and the indictment dismissed.

### 1. 18 U.S.C. 922(g)(1) is Unconstitutional as Applied to Mr. Bolton

The Second Amendment insures that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., Amend. II. Mr. Bolton has principally lived throughout his life with his family in Peekskill, NY. See PSR ¶¶ 44-46, 51. He is a U.S. citizen and fits into the definition of "the people," *i.e.,* "a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008) (citation omitted). As a person in that protected community, he has the constitutional right to possess a firearm and his prior convictions do not abrogate that right.

In *United States v. Bogle*, 717 F.3d 281 (2d Cir. 2013), the Court recognized that under then existing Second Amendment Supreme Court jurisprudence, § 922(g)(1), making it unlawful for a

convicted felon to possess a firearm, did not violate the Second Amendment. In *United States v. Hampton*, 2023 U.S. Dist. LEXIS 100704, \*34 (S.D.N.Y. June 9, 2023) the District Court held that under established Second Circuit precedent § 922(g)(1) does not violate the Second Amendment but recognized "[g]iven Bruen's recency, the case law has not yet developed the parameters of an as-applied <u>Second</u> <u>Amendment</u> challenge" *quoting, United States v. Rowson,* 2023 U.S. Dist. LEXIS 13832, \*39, n. 12 (S.D.N.Y. Jan. 26, 2023).

Mr. Bolton has no adult convictions for crimes of violence. His 2016 federal 924(c) conviction is not a crime of violence. His felony drug convictions are not crimes in which violence, whether actual or attempted, are elements of the offense.

In *Binderup v. A.G. United States*, 836 F.3d 336, 340, 357 (3d Cir. 2016) (*en banc*), the Third Circuit affirmed the District Court of Eastern Pennsylvania's determination that § 922(g)(1), as applied to the two challengers who had been previously convicted of serious crimes, was unconstitutional. One challenger (Binderup) had previously been convicted of a sex crime, the second challenger (Suarez), an illegal gun possession, both punishable by more than two years in prison. While both crimes presumptively qualified for 922(g)(1) applicability, the Court found that the government had failed to demonstrate the bar to their possessing a firearm was consistent with the Second Amendment. *Id*. at 357.

In *N.Y. State Rifle & Pistol Assn. v. Bruen*, the Supreme Court adopted a new approach to firearm regulation stating:

> . . . we hold when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent [\*\*\*21] with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls

outside the Second Amendment's "unqualified command." (citation omitted)

*N.Y. State Rifle & Pistol Assn. v. Bruen,* 142 S.Ct. 2111, 2126 (2022).

After *Binderup* and the Supreme Court's determination in *Bruen*, the Third Circuit determined that a prior conviction for making a false statement to obtain food stamps, a crime punishable by up to five years imprisonment, did not justify § 922(g)(1) applicability. *Range v. A.G. United States*, 2023 U.S. App. LEXIS 13972 (3d Cir. June 6, 2023) (*en banc*). The Third Circuit held:

> Our decision today is a narrow one. Bryan Range challenged the constitutionality of 18 U.S.C. § 922(g)(1) only as applied to him given his violation of 62 Pa. Stat. Ann. § 481(a). Range remains one of "the people" protected by the Second Amendment, and his eligibility to lawfully purchase a rifle and a shotgun is protected by his right to keep and bear arms. Because the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights. We will reverse the judgment of the District Court and remand so the Court can enter a declaratory judgment in favor of Range, enjoin enforcement of § 922(g)(1) against him, and conduct any further proceedings consistent with this opinion.

*Id.* at *20-21; *but see United States v. Hampton*, 2023 U.S. Dist. LEXIS 100704, *34 (S.D.N.Y. June 9, 2023) ["when analyzed with felons in general, the court finds that section 922(g)(1) does not violate the <u>Second</u> <u>Amendment</u> under established Second Circuit precedent."]

Most recently, the district court of the Southern District of Mississippi granted a defendant's application to dismiss a 922(g)(1) charge. In *USA v. Bullock* District Court Judge Carlton W. Reeves, in a 77 page decision, analyzed the current state of Second Amendment jurisprudence after *Bruen* and found that the 922(g)(1) charge was unconstitutionally applied to Mr. Bullock despite his prior felony convictions for manslaughter and aggravated assault. *United States v. Bullock*, 18-Cr-00165 (CWR) (M.S.S.D. June 28, 2023) (Document 79).

Succinctly, Mr. Bolton contends that he is a protected person under the Second Amendment and that his prior non-violent convictions do not vitiate those protected rights. It is requested that the Court void his § 922(g) conviction and dismiss the one count indictment. In the event the Court denies this application, it is requested that Your Honor consider the following points addressed as to sentencing.

## 2. A. The ACCA Enhancement is Not Applicable

In *United States v. Dave Minter*, 20-Cr-389 (S.D.N.Y. 2021) District Court Judge Koeltl dealt with a nearly identical fact pattern to the case at bar. The government contended that following his conviction under 18 U.S.C. 922(g) Minter should be sentenced as an armed career criminal under 18 U.S.C. § 924(e) and be subject to a fifteen year mandatory minimum sentence based upon his qualifying criminal history which included a New York state conviction for Criminal Sale of a Controlled Substance, a narcotic drug, under N.Y. Penal Law § 220.39(1). Judge Koeltl framed the question:

> The government argues that the defendant is an armed career criminal within the meaning of 18 U.S.C. Section 924(e), and therefore subject to a 15-year mandatory minimum sentence. The parties agree that whether the defendant qualifies as an armed career criminal depends on whether his 2014 conviction for criminal sale of a controlled substance in the third degree, in violation of New York Penal Law Section 220.39-1, is a "serious drug offense." The answer to that question depends on whether the narcotic drugs covered by that section of the New York Penal Law are broader than the controlled substances covered by the federal controlled substance law. If the state law covers a broader range of substances, it is not a categorical match for the federal statute and does not qualify as a "serious drug offense" under the federal statute. I already determined in *Baez Medina*, 20 Cr. 24, that the New York statute "controlled all isomers of cocaine while federal law only controls geometric and optical isomers of cocaine," July 21, 2021, transcript at ten. I relied on the plain language of the New York and federal statutes, as well as the legislative history of the New York statute. I agreed with Judge Garaufis in United States against Fernandez-Taveras, 2021 WL 66485, at *5 (E.D.N.Y. Jan. 7, 2021).

> Judge Buchwald has recently reached the same conclusion in United
> States v. Ferrer, 20 Cr. 650, (S.D.N.Y. July 27, 2021) at 45 to 47.

*United States v. Minter*, *Id*., Document 72, pp. 3 – 4.

Judge Koeltl ruled that the prior N.Y.S. drug conviction was not a categorical match with the federal statute because it included a broader range of cocaine isomers than that addressed by the federal statute. As the state drug conviction was a categorical mismatch to the federal drug statute, the Court rejected ACCA applicability.[2]

In *United States v. Boyce*, 2022 U.S. Dist. LEXIS 107096, *7, the district court addressed the same issue in the context of a motion *in limine* to determine whether the defendant was subject to ACCA sentencing enhancement based, in part, upon a 2013 New York prior drug conviction under P.L. § 220.39(1). The Court held it did not, stating: "By its plain language, the New York Statute does not limit the isomers of cocaine considered to be narcotic drugs and instead reaches all isomers of cocaine, including positional isomers and other isomers." (citations omitted). Judge Liman further held:

> The Court thus joins the growing list of courts in this Circuit that
> have held that there is no categorical match between a controlled
> substance under federal law and a narcotic drug under New York
> Penal law. *See Untied States v. Hagood*, No. 20-cr-656 (PAE)
> (S.D.N.Y. Mar. 9, 2022), ECF No. 87; *Gutierrez-Campos*, 2022 U.S.
> Dist. LEXIS 18908, 2022 WL 281582, at *14 (citing cases).[3]

### 2. B. Career Offender Guideline Calculation is Not Applicable

The offense of conviction, 18 U.S.C. 922(g)(1), does not qualify for career offender application as it is neither "a crime of violence or a controlled substance offense." USSG §

---

[2] The government has appealed the court's ruling to the Second Circuit. The appeal has been fully briefed, argued on March 23, 2023 and is now *sub judice*. *United States v. Dave Minter*, 21-3102, United States Court of Appeals for the Second Circuit.

[3] See also, attached non-exhaustive list of cases with similar holdings (Exhibit A).

4B1.1(a)(2).

Both "crime of violence" and "controlled substance offense" are defined at USSG § 4B1.2:

> (a) The term "crime of violence" means any offense under federal or state law . . . that –
>
> (1) has as an element the use, attempted use, or threatened use of physical force against the person of another;
>
> (b) The term "controlled substance offense" means an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

A further review of the varied courts that have analyzed the issue of a NYS prior drug conviction and its applicability for sentencing enhancements is appropriate.

In *United States v. Townsend*, 897 F.3d 66 (2d Cir. 2018), the court recognized that "controlled substance" refers to substances controlled by the Federal Controlled Substances Act "CSA." *Id*. at 68. To find that a prior state drug conviction qualifies as an enhancing predicate offense it must first be determined that "the state conviction aligns with or is a 'categorical match' with federal law's definition of a controlled substance." *Id*. at 72.

In *United States v. Swinton*, 495 F.Supp.3d 197 (W.D.N.Y. 2020) [the district court on remand from the Second Circuit, 797 F.App'x. 589, 602 (2d Cir. 2019)], held that Swinton's prior drug conviction for NYS Penal Law ("NYPL") § 220.39(1) was not a predicate controlled substance offense to justify career offender status under § 4B1.1 of the Federal Sentencing Guidelines based upon a categorical mismatch.

In Mr. Bolton's circumstance, his applicable prior N.Y.S. drug convictions were under NYPL § 220.39(1), *i.e.,* possession with intent to distribute a narcotic drug. The Court in *Swinton*

concluded that that offense is indivisible, and a categorical approach must be used to determine whether the Federal and New York State drug charts were the same at the time of the conviction on the state charge and a defendant's sentencing on the federal charge, *i.e.,* whether New York's definition of a "narcotic drug is broader than its federal counterpart." *Swinton* at 495 F.Supp.3d 205. The *Swinton* sentencing court held that "the state statute must not sweep more broadly than federal law at the time of the prior conviction *and* the same must still hold true at the time of sentencing." *Id*. The question of whether the court must look to the sentencing date of the NYS drug conviction or the federal sentencing date for the instant offense has been resolved by the circuit in *United States v. Gibson*, 60 F.4th 720 (2d Cir. 2023).

The defendant in *Gibson* was convicted of *inter alia* bank robbery. Probation classified him as a career offender based upon a prior 2002 state conviction for attempted criminal sale of a controlled substance in the third degree. NYS Penal Law § 220.39(1) states:

> A person is guilty of criminal sale of a controlled substance in the third degree when he knowingly and unlawfully sells: (1) a narcotic drug.

The district court found a categorical mismatch between the New York state and federal drug schedules in effect at the time of Gibson's prior state drug conviction (2002) and his federal sentencing on the bank robbery (2020) and declined to apply the career offender enhancement sought by the government.

The second circuit affirmed the district court. *United States v. Gibson*, 55 F.4th 153 (2d Cir. 2022). After the Court's decision of the case on December 6, 2022, the government sought a full panel rehearing requesting an amended opinion as to so much of the decision that ruled that the 2015 "removal of naloxegol from the federal controlled substances schedule promulgated under the Controlled Substances Act ("CSA") 21 U.S.C. §§ 801-971, rendered those schedules

categorically narrower than the New York drug schedules applicable to Gibson's 2002 state law conviction." *United States v. Gibson*, 60 F.4th 720, 720 (2d Cir. 2023). The *per curiam* panel refused to adopt the government's timing argument that the Court should look to a comparison of the federal and state drug schedules at the time of the New York state drug conviction when the state and federal drug schedules were aligned. The Court rejected that argument and declined the government's request for an amended opinion stating:

> Plainly, the comparability of New York's 2002 drug schedules and the current federal drug schedules was an issue that the district court was required to, and did, decide in order to make a determination as to what Gibson's Guidelines sentence would be. This Court was required to, and did, determine whether that district court's decision was correct. The government's request for an amended opinion suggesting that these rulings were not holdings is denied. (*Id*. at 723)

While the *Gibson* analysis premised the categorical mismatch on the drug Naloxegol and its removal from the Federal CSA as of January 2015, other courts have found that the New York drug schedules are broader than their federal counterparts in the comparative definitions of cocaine isomers.

As the district court explained in *United States v. Fernandes-Taveras*, 511 F.Supp.3d 367, 373, 374 (E.D.N.Y. 2021):

> According to the definition of "isomer" under CSA, as used in Section 1308.12(b)(4), covering cocaine, "the term 'isomer' means any optical or geometric isomer." 21 C.F.R. § 1300.01(b). In addition to optical and geometric isomers, there are also "positional" isomers, which are not included in the definition of cocaine. Phifer, 909 F.3d at 378. In contrast, in the subsection of the CSA's definitions covering hallucinogenic drugs, "'isomers' means any optical, positional, or geometric isomer." 21 C.F.R. § 1300.01(b).
>
> Thus, the federal scheme excludes positional isomers from its definition of cocaine but includes them in its definition of hallucinogens. The New York Legislature made a different policy choice to define cocaine as broadly as possible, including all

isomers.

This Court (Karas, J.) has similarly determined that the cocaine isomer distinction between the New York state and Federal statutes precludes a career criminal sentencing enhancement *United States v. Mark Maiuzzo*, 22-Cr-313, Doc. No. 15, Hon. Kenneth Karas, S.D.N.Y. 11/30/2022 (see sentencing transcript, attached as Exhibit B, pp. 32-39).

## 2. C. The Guideline Enhancement Under USSG § 2K2.1(a)4(A) Should Not Apply

While the PSR at pages 6-7, 16 and 26, paragraphs 17-27 and 73 recommends a BOL of 20, less 3 points for acceptance of responsibility, with a criminal history category V (*i.e.,* 17/V, 46 to 57 months) the defendant believes this overstates his base offense level contending that the § 2K 2.1 enhancement to 20 should not apply and is 14 not 20 under ¶ 2K 2.1(a) 6. For reasons previously outlined, the 6 point enhancement (from 14 to 20) can only be arguably based upon Mr. Bolton's 2016 federal drug conspiracy conviction. The circuits are split on a drug conspiracy's applicability as it is an inchoate crime.

In *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023) (*en banc*) the court concluded that a controlled substance offense as defined in § 4B1.2(b) does not include inchoate offenses such as attempt or conspiracy. *Id.* 1280. The *Dupree* court acknowledged the commentary, application note 1, which includes attempt and conspiracy in defining a controlled substance offense. The court states at page 1279: "[w]e conclude that the test of § 4B1.2(b) unambiguously excludes inchoate crimes." Therefore, there was no need to refer to the commentary. *See also United States v. Havis*, 927 F.3d 382 (6th Cir. 2019) (*en banc*) [The guideline definition of a controlled substance offense does not include inchoate crimes such as attempts.]; *see also, United States v. Campbell*, 22 F.4th 438, 440 (4th Cir. 2022); *United States v. Monroe*, 2022 U.S.App. LEXIS 14446 (4th Cir. 2022); *United States v. Winstead*, 890 F.3d 1082 (D.C. Cir. 2018).

On May 31, 2023 the Ninth Circuit ruled similarly. In analyzing the commentary's inclusion of conspiracy, attempt and aiding and abetting to "controlled substance offenses," it recognized that the Supreme Court in *Kisor v. Wilkie*, 139 S.Ct. 2400 (2019), announced a more demanding standard to an agency's interpretation of its own rules which necessarily *must* be applied to the guidelines commentary. The appeals court reversed and remanded finding that conspiracy to sell narcotics is not a controlled substance offense qualifying as a predicate for career offender status. The Court stated:

> Because only the commentary includes inchoate crimes, and the text of the guideline unambiguously does not, applying the Supreme Court's *Kisor* analysis, we must conclude that Castillo's conspiracy conviction does not qualify as a "controlled substance offense" under U.S.S.G. § 4B1.2(b).

*United States v. Castillo*, 2023 U.S. App. LEXIS 13373, *13 (9th Cir. 2023).

The Second Circuit has ruled differently: *United States v. Wynn* (Amended Summary Order), 845 Fed. App'x. 63 (2d Cir. 2021) [binding authority precludes the defendant's procedural challenge contending that Application Note 1 to Section 4B1.2 does not apply]; *United States v. Richardson*, 958 F.3d 151, 155 (2d Cir. 2020) [the Sentencing Commission had the authority to include inchoate offenses within the definition of "controlled substance offense"]; *United States v. Tabb*, 949 F.3d 81, 88 (2d Cir. 2020) ["The text and structure of Application Note 1 demonstrate that it was intended to include Section 846 narcotics conspiracy."][4]

## 2. D. The Defendant Challenges the Probation Report's Calculation of His Criminal History

In calculating the defendant's criminal history, they attribute three points for his NY CSCS

---

[4] The United States Sentencing Commission published Amendments to the Federal Sentencing Guidelines on April 27, 2023 which are not yet in effect. One of the Amendments addresses the circuit conflicts by the commentary including inchoate offenses such as conspiracy in the guideline text definition of "controlled substance offense" as defined in USSG § 4B1.2(b).

3° arrest in 2011 which resulted in his participation in a diversionary drug court program and his sentencing on March 5, 2014 to two years of imprisonment followed by two years of post release supervision. PSR p. 8, ¶ 33.

For his October 20, 2014 conviction and sentence of thirty months they assign three points. PSR p. 9, ¶ 34. Although the sentence was thirty months, Mr. Bolton satisfies that term of imprisonment by entering and successfully completing the New York State Department of Corrections and Community Supervision (DOCCS) shock incarceration program at Lakeview Correctional Facility in Chautauqua County, New York.

> The program provides selected incarcerated individuals a special six month program of shock incarceration stressing a highly structured routine of discipline, intensive regimentation, exercise and work therapy, together with substance abuse treatment, education, pre-release counseling and life skills counseling.

(see attached Exhibit F, https://doccs.ny.gov/system/files/documents/2021/08/0086_0.pdf). This bootcamp regimen program allows the successful inmate the ability to complete this six month program making him immediately eligible for parole rather than serving the incarceration sentence imposed by the court. Here his term of imprisonment was thirty months or one and a half years as a mandatory minimum which was satisfied by his completion of the six month program. This diversionary program premised as it was upon a finding of guilt is rightfully counted USSG § 4A1.2(b). Mr. Bolton believes he should only receive two rather than three points as he was eligible to serve six months rather than thirty months.

In 2018 the federal court sentenced him to time served (twenty-six months) and probation credits him with three criminal history points. PSR p. 9, ¶ 35.

As Mr. Bolton was serving a supervised release sentence at the time of his arrest, probation, pursuant to USSG § 4A1.1(d) adds two points to his criminal history tally yielding eleven points

and a category V.

The United States Sentencing Commission published Amendments to the Federal Sentencing Guidelines on April 27, 2023. One of these Amendments to § 4A1.1(e) deals with the imposition of so-called "status points," *i.e.*, points added because the offense was committed while serving a probation or supervised release sentence. The new Amendment reads:

> 5. §4A1.1(e). One point is added if the defendant (1) receives 7 or more points under §4A1.1(a) through (d), and (2) committed any part of the instant offense (i.e., any relevant conduct) while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status. Failure to report for service of a sentence of imprisonment is to be treated as an escape from such sentence. See §4A1.2(n). For the purposes of this subsection, a "criminal justice sentence" means a sentence countable under §4A1.2 (Definitions and Instructions for Computing Criminal History) having a custodial or supervisory component, although active supervision is not required for this subsection to apply. For example, a term of unsupervised probation would be included; but a sentence to pay a fine, by itself, would not be included. A defendant who commits the instant offense while a violation warrant from a prior sentence is outstanding (e.g., a probation, parole, or supervised release violation warrant) shall be deemed to be under a criminal justice sentence for the purposes of this provision if that sentence is otherwise countable, even if that sentence would have expired absent such warrant. See §4A1.2(m).

So therefore, under that Amendment Mr. Bolton would receive one rather than two status points as they are counted under PSR p. 10, ¶ 37. The Amendments however do not become effective until November 1, 2023.

If the Court would agree to this one point status point reduction and one point for the shock incarceration sentence then it would culminate in nine points and a category IV criminal history.

### 3. The Defendant's Incarceration

Mr. Bolton was arrested at his girlfriend's apartment in Yorktown on April 18, 2022. He

has been continuously incarcerated at the Metropolitan Detention Center ("MDC") Brooklyn since then. During his incarceration, he has experienced the enhanced restrictions imposed upon inmates necessitated by the Covid-19 pandemic and the jail's administrative decisions. He has been subjected to weeks of quarantine, leaving him in a cell with only minutes to attend to basic hygiene. While some pandemic restrictions eased, every time a Covid infection occurred, the jail house was shuttered, and the onerous quarantine conditions were reimposed. These same restrictions were imposed on inmates as a disciplinary measure despite the fact the defendant and others engaged in no wrongdoing.

Suffice it to say the defendant's incarceration over the last fourteen months has not been easy. The ever-present risk of contracting Covid in an institutional setting custom made for contagion, repeated quarantines with lock downs, isolation, separation from family and friends with little opportunity for visitation has had its effect. The circumstance of incarceration during the pandemic is a reality that should be considered by the sentencing court. As District Court Judge Paul A. Engelmayer dramatically stated:

> In the Court's judgment, a day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably experienced as more punishing.

*United States v. McRae*, 2021 U.S. Dist. LEXIS 8777, at *12 (S.D.N.Y. Jan. 15, 2021); *see also United States v. Pena*, 2021 U.S. Dist. LEXIS 21669 at *7 (S.D.N.Y. Feb. 4, 2021) (consideration of Section 3553(a) factors should account for the reality that incarceration during the pandemic has exacted a greater toll upon inmates). This Court (Karas, J.) has also recognized jail conditions as a legitimately factored sentencing consideration in prior cases.

Mr. Bolton maintained a log of his jail conditions since the time of his arrest (see Exhibit

C). This diary reflects repeated Covid quarantines with days of 24 hour lockdown where he was only given 15 or 20 minutes to shower with no privileges. In September of 2022 his unit alone had 46 confirmed cases including his own infection. Jail administration disciplinary decisions and staff shortages occasioned repeated lockdowns all taking its toll on an inmate such as Mr. Bolton who has had no disciplinary issues despite the fact he was jumped by gang members, suffered a dislocated shoulder, and had his property stolen.

Despite these harsh conditions of confinement, he has tried to make the best of his situation (PSR p. 4, ¶ 5) and has completed multiple online courses in various subjects as offered by Columbia University, the Bureau of Prisons, and the MDC Brooklyn Recreation Department (see Completion Certificates attached as Exhibit D).

### 4. Personal History and Circumstances

We are all products of our upbringing; some for the better, some for worse. Like many of the defendants sentenced by this Court, Mr. Bolton had a difficult childhood. He had no relationship with his biological father and his mother, Erlene Lamar, was an alcoholic. He reports that his mother frequently beat him with objects such that the beatings seemed normal. He and his siblings were left alone often; they frequently had no food to eat. CPS was a regular presence and there were multiple instances of removal. PSR pp. 11-12, ¶¶ 44-47.

When Eric was in the third grade, he was taken in by his basketball coach, Jarvis Humphries and his wife. He lived with the Humphries for approximately five years before returning home to his mother. The Humphries raised and cared for him as their own. One can only imagine how things may have turned out differently for Eric had he stayed with the Humphries. That is a question he has asked himself many times. Jarvis Humphries, this basketball coach with a heart of gold, writes to you on Eric's behalf describing the young man his wife and he raised and came to

love (see Jarvis Humphries's letter, part of Letters, Exhibit E).

Eric eventually reconciled with his mother after she achieved sobriety. She unfortunately was in a car accident approximately ten years ago and after surgery, she became paralyzed. One of her legs has since been removed. He now has a good relationship with her and was caring for her at the time of his arrest on the current offense. PSR ¶¶ 44, 49.

## 5. Instant Offense Circumstances

A probation officer and members of local law enforcement arrested Eric Bolton at his girlfriend's apartment residence in Yorktown, New York. Probation was aware that he was living with his mother in Peekskill but would occasionally stay over at his girlfriend's residence. His girlfriend had recently testified as a trial witness for the government in *USA v. Myron Wagner A/K/A My Dogg,* 20-Cr-00410 (NSR). Wagner had been charged by the government with a violation of 18 U.S.C. 922(g)(1) (felon in possession). Wagner, who is the father of the girlfriend's child, according to the complaint filed against him, pulled a silver revolver and shot at her through her car windshield as she was driving to Peekskill Police Headquarters to file criminal charges against him. There had been prior occasions of domestic abuse. *USA v. Wagner*, 20-Cr-00410 (NSR) (see Complaint, Docket Document # 1).

Wagner had previously been convicted in federal court of a crack cocaine distribution conspiracy and had been sentenced to 45 months of incarceration. According to Mr. Bolton, his girlfriend came to him, afraid for her safety, and asked his help in getting her a gun, which he did, knowing it was stupid for him to do so. PSR p. 6, ¶ 16. This was the gun found in her backpack in the hamper in her bedroom. While the girlfriend told the police she knew nothing about the gun, and that it was not hers, she confirmed to Richard Willstatter, Mr. Bolton's prior lawyer, that it was in fact her gun that had been given to her for her protection but that she didn't want to get into

trouble with the police[5] (see Exhibit G, Declaration of Richard Willstatter).

While Mr. Bolton intended to help her, his assistance was shortsighted, wrong headed and illegal. He had been on supervised release for almost four of the five year term when he committed the instant criminal activity in obtaining and possessing the firearm. He was employed in a well-paying job. He had his son. Now he has lost it all and is also subject to additional incarceration for violation of his supervised release which is pending before this Court.

## 6. § 3553 Factors

### 1. The Nature and Circumstances of the Offense and the History and Characteristics of the defendant

#### a. The Offense:

As previously outlined, the defendant was arrested at his girlfriend's apartment on April 18, 2022. A search of the bedroom revealed a loaded pistol with ammunition in her hamper. Mr. Bolton has acknowledged his guilt of the instant charge and admitted that he obtained the gun at the girlfriend's request for her personal safety as she had recently given trial testimony for the government against her daughter's father. She was afraid for her safety. See point 4 *infra*. PSR p. 6, ¶ 16.

#### 1. b. The History and Characteristics of the Defendant

Mr. Bolton began his supervised release in June of 2018 after serving his twenty-six months time served federal sentence. He obtained a good paying job, cared for his disabled paralyzed mother and helped raise his son. PSR p. 9, ¶ 35, pp. 11-13, ¶¶ 44-52. The letters attached as Exhibit E, principally from his childhood basketball coach and care provider, Jarvis Humphries and his

---

[5] Upon receiving this information from her, Mr. Willstatter realized he may be in a conflict situation and requested that he be relieved of his CJA assignment and new counsel assigned. This Court granted that application on July 8, 2022. *United States v. Bolton*, 20-Cr-445 (KMK), Doc. 223.

oldest sister Janet Lamar, reveal a decent person willing to love and be loved and extend himself for others.

## 2. a. The Need for the Sentence Imposed: To Reflect the Seriousness of the Offense, to Provide Respect for the Law, and to Provide Just Punishment for the Offense

Probation has recommended a sentence, based in part upon their guideline calculation of 46 months of imprisonment. PSR pp. 26-28.[6] This would be twenty months longer than his prior federal sentence which was the longest period of incarceration he had ever served.

The defendant has now been incarcerated for over fourteen months and the conditions of his confinement predicated in part upon global pandemic and the MDC's administration of lockdown conditions as previously outlined have been excessively harsh and difficult.

It is doubtful that anyone would regard that confinement as inadequate to promote general deterrence and respect for the law.

## 2. b. To Afford Deterrence to Criminal Conduct; Protect the Public and Provide the Defendant with Training and Education in the Most Effective Manner

Mr. Bolton, having served over fourteen months of the instant offense, now also faces incarceration for his violation of supervised release. He recognizes the impact his incarceration has on his family and future. During his confinement, as has been outlined, he has tried to do as many things as his incarceration will allow to better himself. He has had no disciplinary issues.

---

[6] In their June 15, 2023 PSR (Document 20), as part of their recommendation for a 46 month sentence, the probation officer reports at page 27, last paragraph, that the defendant's criminal history reflects violence and that he "brandished a firearm." We believed that representation was inaccurate. There is nothing in his criminal record to support that he "brandished a firearm" or that he was physically violent. His youthful offender adjudication, as it was explained to me, involved a group of youths who took a cell phone from another youth after another boy (not Bolton) punched the victim. This objection was voiced and by a revised PSR dated June 29, 2023 (Document 23) at page 28, last paragraph, they removed the assertion of physical violence and that he "brandished a firearm."

PSR p. 15, ¶ 64. He is currently working at the jail as a barber.

### **3. and 4. The Kind of Sentence and the Sentencing Range Established**

For reasons already indicated, probation's calculation of a guideline range of 46-57 months is dramatically more severe than Bolton's calculation which would yield 21-27 months. A sentence in that guideline range is the kind of sentence that would provide respect for the law and based upon the facts of the case provide a sentence sufficient but not greater than necessary in compliance with the statutory mandate.

### **Conclusion**

Based upon the authority of *Bruen* and post *Bruen* Second Amendment jurisprudence, the constitutionality of 18 U.S.C. 922(g)(1) as applied to Mr. Bolton is questionable.

The facts and circumstances of this case and the 3553 factors merit the request for a below guideline sentence in this case. Mr. Bolton is still exposed to a separate punishment for his violation of supervised release which is already considered in his criminal history status point calculation. The longest sentence he has ever served was his 2016 federal conviction, a period of 26 months. While he did not successfully complete his term of supervised release, he apparently was able to take steps to change his life by getting a decent job, reestablishing his relationship with his young son and family and for a while escaping his marijuana drug habit which has haunted him since he was twelve years old. For these reasons it is requested that the Court consider imposing a variant, below guideline sentence.

Dated: White Plains, New York
     July 11, 2023

Respectfully submitted,

STEPHENS, BARONI, REILLY & LEWIS, LLP

By: _____

STEPHEN R. LEWIS, ESQ.
*Attorneys for Defendant, Eric Bolton*
175 Main Street, Suite 800
White Plains, New York 10601
914-683-5185
slewis@sbrllaw.com

# EXHIBIT A

*USA v Eric Bolton*

22-Cr-330 (KMK)

List of District Court Cases Holding
NY Drug Convictions Categorically Overbroad

District Court Cases Holding New York Drug Conviction Categorically Overbroad

1. Sent'g Tr. at 32-39, *United States v. Maiuzzo*, 22-Cr-313 (S.D.N.Y. Nov. 30, 2022 [Karas, J.], see attached Exhibit B).

2. Sent'g Tr. at 5-8, *United States v. Hennis*, 21-Cr-354 (E.D.N.Y. June 13, 2022) (Donnelly, J.), ECF No. 49.

3. Sent'g Tr. at 19-20, *United States v. Smith*, 20-Cr-317 (S.D.N.Y. Jan. 28, 2022) (Swain, J.), ECF No. 87.

4. Sent'g Tr. at 11-16, *United States v. Campbell*, 20-Cr-651 (S.D.N.Y. Nov. 23, 2021) (Halpern, J.), ECF No. 46.

5. Sent'g Tr. at 6-10, *United States v. Savinon*, 21-Cr-233 (S.D.N.Y. Sept. 22, 2021) (Liman, J.), ECF No. 25.

6. Sent'g Tr. at 16-17, *Untied States v. Galdieri*, 19-Cr-757 (S.D.N.Y. Sept. 10, 2021) (Furman, J.) ECF No. 143.

7. Sent'g Tr. at 15-20, *United States v. Rollins*, 19-Cr-34 (W.D.N.Y. July 1, 2020) (Skretny, J.), ECF No. 64.

8. Sent'g Tr. at 6-11, *United States v. Baez-Medina*, 20-Cr-24 (S.D.N.Y. July 1, 2021) (Koeltl, J.), ECF No. 50.

9. Sent'g Tr. at 25-26, *United States v. Butler*, 19-Cr-177 (S.D.N.Y. Feb. 12, 2020) (Daniels, J.), ECF No. 26.

10. Sent'g Tr. at 5-6, *United States v. Augustine*, 17-Cr-753 (S.D.N.Y. Sept. 19, 2019) (Seibel, J.), ECF No. 332.

11. Sent'g Tr. at 14-15, *United States v. Santana*, 18-Cr-865 (S.D.N.Y. Aug. 22, 2019) (Caproni, J.), ECF No. 41.

# EXHIBIT B

*USA v Eric Bolton*

22-Cr-330 (KMK)

Sentencing Transcript (pp. 32-39)
*USA v. Maiuzzo*, 22-Cr-313 (KMK)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x
UNITED STATES OF AMERICA

          v.                   22 CR 313 (KMK)

MARK MAIUZZO,

               Defendant.

--------------------------------x

                  U.S. Courthouse
                  White Plains, N.Y.
                  November 30, 2022
                  2:30 p.m.


Sentencing Before:    HON. KENNETH M. KARAS,
                      United States District Judge




APPEARANCES

**UNITED STATES ATTORNEY**
**SOUTHERN DISTRICT OF NEW YORK**
**300 Quarropas Street**
**White Plains, N.Y.  10601**
BY:  QAIS GHAFARY
**Assistant United States Attorney**

JILL R. SHELLOW, Esq.
Attorney for Defendant




Sue Ghorayeb, R.P.R., C.S.R.
Official Court Reporter

1        THE COURT:  All right.  Please be seated.

2        Anything anybody else wants to add before — I don't

3   want to cut you off.  So, anything else?

4        MR. GHAFARY:  Not from the Government, Your Honor.

5   Thank you.

6        THE COURT:  Ms. Shellow, anything else?

7        MS. SHELLOW:  No.  I point to Your Honor a case that

8   the Government cites on page 7.  It doesn't ever give the full

9   citation for it, but it's Hylton v. Sessions.

10       THE COURT:  Yes, I know.  I've read that, yes.

11       MS. SHELLOW:  Okay.

12       THE COURT:  I mean, it still begs the question that

13  has to be addressed here.  So, I don't think Hylton really —

14       MS. SHELLOW:  Okay.

15       THE COURT:  But I appreciate what you were probably

16  going to say, which is that it doesn't really help the

17  Government.

18       MS. SHELLOW:  That's right.  But they do — they do

19  indicate that it's a cf. cite, so.

20       THE COURT:  Yeah, which always makes it suspect

21  anyways.

22       So, here is my take on this, and as I said, I think,

23  you know, in the other cases, one was an issue about what the

24  law was at the time, which here it is — that's not an issue,

25  because the New York State definition was adopted in 1978, so

1    that obviously covers 2005 and 2006 to the present. So,

2    there's no question, at least with respect to the isomer

3    issue, that whatever gap exists today existed back in 2005 and

4    2006, and the Government doesn't say otherwise. And as Mr.

5    Ghafary concedes, more than just him have been looking at this

6    issue in the U.S. Attorney's Office. So, I think we can

7    safely assume it would have been different, and all of the

8    cases that I've read, obviously, go along with that, because

9    no one even raises the possibility that at the time of the

10   prior convictions there was any —— that the federal and state

11   schedules were the same.

12          So, I think my view of this is that, I think that at

13   the end of the day Ms. Shellow is right that there is a

14   difference between New York state law and federal law when it

15   comes to the definition of cocaine and, in particular, the

16   inclusion of isomers.

17          So, the federal law, which I think is the better one

18   to start, because it's more narrow, says —— so, there's the

19   definition of cocaine in 21 C.F.R. Section 1308.12(b)(4), and

20   under what is now C.F.R. —— 21 C.F.R. 1300.01(b), an "isomer

21   as used in Section 1308.12(b)(4) means the 'optical or

22   geometric isomer.'" And just to be clear, isomers are

23   "chemical compounds that have the same composition but differ

24   in the chemical arrangement of their constituents;" and that's

25   actually from the Second Circuit's decision in Merck Eprova AG

1  v. Gnosis S.p.A, 760 F.3d 247, at 252, and there are a number

2  of different types of isomers.

3       And I understand the Government's point that, you

4  know, for a long time people thought there were only eight and

5  it's only because of this sort of defense position that people

6  are reevaluating.  I don't think that's really right, because

7  there are these different definitions in the federal and state

8  statute.  So, there clearly has been a recognition of the

9  different types of isomers, but the federal definition only

10 extends to optical or geometric isomers of cocaine.  But the

11 New York definition doesn't limit the type of isomers that

12 fall within its definition of cocaine.  Instead, New York's

13 definition of cocaine covers isomers other than optical and

14 geometric, and as Ms. Shellow points out, it includes

15 positional isomers as well as others.

16       And I think what's really telling is that, to the

17 extent the federal government wanted to be more inclusive on

18 its definition of isomer, it actually has done that.  So, with

19 respect to — for example, in 1300.01(b)(21):  "The term

20 isomer means the optical isomer, except as used in Section

21 1308.11(d) and 1308.12(b)(4) of this chapter.  As used in

22 Section 1308.11(d) of this chapter, the term isomer means the

23 optical, positional, or geometric isomer.  As used in Section

24 1308.12(b)(4) of this chapter, the term isomer means the

25 optical or geometric isomer."

1    So, isomer, you know, the federal government knows

2    that there are these different types of isomers and it made a

3    choice to have a more limited definition.  So, for example,

4    cocaine versus hallucinogens, and that's what 1308.11(d)

5    covers.  So, it's a broader definition for hallucinogens, but

6    it's a more narrow definition limited to optical or geometric

7    isomers with respect to cocaine.  And, so, clearly, if the

8    federal government had wanted to, it could have included

9    positional or other isomers in its definition of cocaine, but

10   it obviously elected not to do so.  And, so, as it's written,

11   it's pretty clear that the -- that the limitation on the

12   cocaine isomers to cover only optical and geometric isomers

13   and others was intentional.  And, so, to the extent that the

14   New York statute criminalizes conduct involving isomers that

15   are not covered by the federal statute, then, on its face,

16   it's not indeterminate, it's pretty clear.

17   And I think it's also important to note that there

18   was a reason New York did this, and this is all spelled out in

19   Judge Cronan's decision in U.S. v. Gutierrez-Campos, 2022

20   Westlaw 281582.  And Judge Cronan explains why it was that

21   New York did this back in 1978, and part of it was that the

22   New York legislature was concerned about the increasing number

23   of challenges being brought in federal prosecutions over

24   whether certain isomers constituted controlled substances.

25   And, in particular, the legislature was apparently concerned

1    with the difficulty in distinguishing between a "levo isomer,"

2    which "occurs naturally in coca leaves and can be chemically

3    synthesized, so this isomer is clearly within Schedule

4    II(a)(4)," and a "dextro isomer," which is "the mirror image

5    of the levo isomer" but "is not chemically identical." And,

6    so, that apparently led to some big debate among chemists,

7    which maybe, Ms. Shellow, as I understand, your father wasn't

8    a chemist, but clearly was involved in this conversation, it

9    sounds like.

10        MS. SHELLOW:  When I was a child — actually, I'm

11   not sure that I was a child.

12        THE COURT:  We don't have to date ourselves.

13        MS. SHELLOW:  Right, exactly.  The way it was

14   described to me is as chiral, two hands, left and right, of

15   that debate.

16        THE COURT:  Okay.  Well, there you go.

17        And, so, I think — but the point here is that

18   this — none of this is happenstance, none of this is sort of

19   left to the imagination, and, therefore, we don't need to get

20   into a conversation about what's, you know, realistic

21   possibility.  New York made an intentional decision to have a

22   broader definition of isomers, cocaine isomers, and the

23   federal government made a conscious decision to have a more

24   narrow definition.

25        And, so, I think Mr. Ghafary, who — by the way, you

 1   know, in terms of who scored points, you score 10 out of 10.

 2   You've done a great job making the best argument you can.

 3          And, so, the point the Government makes is, "well,

 4   okay, show us where there have been these prosecutions," and

 5   it's a fair point, but that only matters if there is

 6   indeterminacy and I just don't think there is here.

 7          So, I think a tip of the cap to Judge Cronan, who I

 8   think did a really excellent analysis on this, and I read some

 9   of the others and they too did a nice job.  But I think the

10   logical force of Ms. Shellow's reasoning and Judge Cronan's

11   persuade me that in this case, you know, which really is

12   focussed on the isomer question, and, again, because there's

13   no issue about the schedules being different back in '05-'06,

14   I agree that the prior convictions do not serve as predicates

15   to qualify Mr. Maiuzzo to being a career offender.

16          You know, naloxegol I think is a different story,

17   but I don't need to worry about that, so I'm not going to.

18          So, in terms of the PSR, then we have to make some

19   changes.  So, Paragraph 25 should go away — please check me

20   on this everybody — because I'm saying that the career

21   offender label does not apply here, right?

22          Ms. Shellow, I assume you agree with that?

23          MS. SHELLOW:  Yes, that is correct, Your Honor.

24          THE COURT:  Okay.  So, what happens is, is that the

25   Adjusted Offense Level stays at 16, and then the three levels

1   are applied and we get down to 13.  Right?

2               MS. SHELLOW:  Right.

3               THE COURT:  Okay.  And then the criminal history

4   category, all of the analysis is fine in terms of the actual

5   individual scoring.  So, 39 stays the same, it's still a 12.

6   The two points are still added under 4A1.1(b) in Paragraph 40,

7   and the Criminal History Category is still going to be VI, but

8   we just take out that last sentence of Paragraph 41, right?

9               Because that's the alternative analysis, that it's a

10  Category VI because of the career offender provision.

11              MS. SHELLOW:  That's correct, Your Honor.

12              THE COURT:  Okay.  And that means that Paragraph 90

13  needs to change.  So, instead of saying 29, it needs to say

14  13.  And, then, at a Total Offense Level 13, Criminal History

15  Category VI, the guideline range is 33 to 41 months.  Correct?

16              MS. SHELLOW:  That's correct.

17              THE COURT:  Okay.  I'm relying on people who know

18  numbers.

19              MS. SHELLOW:  That's correct, Your Honor.  At the —

20  at the end of this, when you have requested all of the changes

21  to the PSR, I'm going to ask Your Honor to give us until

22  tomorrow, so that both Mr. Ghafary and I can check it to make

23  sure that we haven't missed any paragraphs.

24              THE COURT:  Yes, that's fine.  Of course.

25              MS. SHELLOW:  Thank you.

                Sue Ghorayeb,  Official Court Reporter

1       THE COURT: And he strikes me as probably being

2   pretty good at numbers too. I definitely could have copied

3   your math homework, kid, no doubt about it.

4       But so far we agree on this, right?

5       Mr. Ghafary, do you agree?

6       I mean, you're objecting to my analysis, but once

7   I've applied the analysis, so far the math is right?

8       MR. GHAFARY: Yes, Your Honor.

9       THE COURT: Okay. And, then, you know, obviously,

10  the recommendation section, that changes. So, it's a 13

11  instead of a 29. And, as I said, it's 33 to 41, instead of

12  151 to 188. Sure. So, it's instead of 151 to 188, it's 33

13  to 41 months.

14      Okay. And, so, are we ready to have the 3553(a)

15  conversation?

16      MS. SHELLOW: We are, Your Honor.

17      THE COURT: Okay. The floor is yours, Ms. Shellow.

18  I'll let you go first. Mr. Ghafary can respond. You can

19  reply. Otherwise, we'll give your client the opportunity at

20  the last word if there's something he'd like to say.

21      MS. SHELLOW: Mr. Maiuzzo is, is a cocaine addict,

22  that's been well-established both before Judge Sullivan, as a

23  practical matter, the Government agrees, and he spent an

24  enormous quantity of time in jail, which is how we deal with

25  addicts who sell or distribute in order to support their

# EXHIBIT C

*USA v Eric Bolton*

22-Cr-330 (KMK)

Log of Jail Conditions

--------------------------------------------------------------------------------

JECT:
ʃE: 04/11/2023 12:15:11 PM

ƆCKDOWN TIMELINE

**MONTH OF APRIL**
On April 18, 2022 Arrived at MDC Brooklyn. Placed in housing unit #41 quarantine unit for 14 days 24 hour lockdown.
April 21, 2022 - 20 MINUTES TO SHOWER USE PHONE OR COMPUTER.
Apr 24, 2022 - 20 MINUTE TO SHOWER USE PHONE OR COMPUTER
Apr 27, 2022 - 20 MINUTES TO SHOWER USE PHONE OR COMPUTER
Apr 30, 2022 - 20 MINUTES TO SHOWER USE PHONE OR COMPUTER

**MONTH OF MAY - NO SHOWERS , PHONE, RECREATION.**
May 3, 2022 Transferred to housing unit #71
May 7, 2022 locked in shortage of staff - NO SHOWER, PHONE, REC.
may 8, 2022 locked in shortage of staff - NO SHOWER, PHONE, REC.
May 14, 2022 locked in shortage of staff
may 15, 2022 locked in shortage of staff

On or about May 18, 2022 inmate got stabbed to death jail on lockdown

May 21, 2022 10 MINUTE SHOWER - NO PHONE, NO REC
may 24, 2022 10 MINUTE SHOWER - NO PHONE, NO REC
may 27, 2022 10 MINUTE SHOWER - NO PHONE, NO REC
may 30, 2022 10 MINUTE SHOWER -NO PHONE, NO REC

**MONTH OF JUNE -NO PHONE, RECREATION**
June 2, 2022 - 10 MINUTE SHOWERS NO PHONE NO REC
June 5, 2022 - 10 MINUTE SHOWERS NO PHONE NO REC
June 8, 2022 - 10 MINUTE SHOWERS NO PHONE NO REC
June 11, 2022 - 10 MINUTE SHOWERS NO PHONE NO REC

FROM THE DAY OF MAY 18, 2022 UP UNTIL ABOUT JUNE 13, 2022 WE WERE GIVEN A BAG OF FOOD FOR
BREAKFEST, LUNCH AND DINNER NOT ONE HOT MEAL.

On or about June 13, 2022 jail put on modified lockdown 15 cells out at a time for 1 and a half hours for one month with a
schedule for which cells come out and at what time.

June 18, 2022 - SHORTAGE OF STAFF
June 19, 2022 - SHORTAGE OF STAFF
June 25, 2022 - SHORTAGE OF STAFF
June 26, 2022 - SHORTAGE OF STAFF

**MONTH OF JULY - NO SHOWERS, PHONE, RECREATION**
July 2, 2022 - SHORTAGE OF STAFF
July 3, 2022 - SHORTAGE OF STAFF
July 9, 2022 - SHORTAGE OF STAFF
July 10, 2022 - SHORTAGE OF STAFF

On or about July 11, 2022 jail still on modified lockdown but half of the unit is out for 3 hours than the other half comes out for 3
hours. Then everyone is locked in for remainder of the day for a month schedule updated.

July 16, 2022 - SHORTAGE OF STAFF
July 17, 2022 - SHORTAGE OF STAFF
July 23, 2022 - SHORTAGE OF STAFF - OUT FOR 1 HOUR
July 24, 2022 - SHORTAGE OF STAFF
July 30, 2022 - SHORTAGE OF STAFF

-------------------------------------------------------------------------------------------------

July 31, 2022 - SHORTAGE OF STAFF - OUT FOR 1 HOUR

MONTH OF AUGUST - NO SHOWERS, PHONE, RECREATION
Aug 6, 2022 - SHORTAGE OF STAFF
Aug 7, 2022 - SHORTAGE OF STAFF

On or about august 13, 2022 jail is to resume normal movement.

Aug 14,2022 - SHORTAGE OF STAFF
Aug 20, 2022 - SHORTAGE OF STAFF
Aug 21, 2022 - SHORTAGE OF STAFF
Aug 27, 2022 - SHORTAGE OF STAFF - OUT FOR 2 HOURS
Aug 28, 2022 - SHORAGE OF STAFF

MONTH OF SEPTEMBER - NO SHOWERS, PHONE, RECREATION
Sep 4, 2022 - SHORTAGE OF STAFF
Sep 5, 2022 - SHORTAGE OF STAFF
Sep 11, 2022 - SHORTAGE OF STAFF
Sep 12, 2022 - SHORTAGE OF STAFF

On or about September 16, 2022 Unit #71 the unit I was housed in had a covid outbreak, 46 confirmed cases including myself.
Unit put on lockdown for 14 days. NO PHONE, NO VISITS, NO REC, NO COURT.

Sep 19, 2022 - 15 MINUTE SHOWER NO PHONE NO REC
Sep 22, 2022 - 15 MINUTE SHOWERS NO PHONE NO REC
Sep 25, 2022 - 15 MINUTE SHOWERS NO PHONE NO REC
Sep 28, 2022 - 15 MINUTE SHOWERS NO PHONE NO REC

MONTH OF OCTOBER - NO SHOWERS, PHONE, RECREATION
Oct 8, 2022 - SHORTAGE OF STAFF
Oct 9, 2022 - SHORTAGE OF STAFF - OUT FOR 1 HOUR
Oct 15, 2022 - SHORTAGE OF STAFF
Oct 16, 2022 - SHORTAGE OF STAFF
Oct 17, 2022 - FIGHT ON UNIT
Oct 22, 2022 - SHORTAGE OF STAFF
Oct 23, 2022 - SHORTAGE OF STAFF
Oct 26, 2022 - CUTTING ON UNIT
Oct 29, 2022 - SHORTAGE OF STAFF
Oct 30, 2022  - SHORTAGE OF STAFF

MONTH OF NOVEMBER - NO SHOWERS, PHONE, RECREATION
Nov 5, 2022 - SHORTAGE OF STAFF
Nov 6, 2022 - SHORTAGE OF STAFF
Nov, 8, 2022 - EMERGENCY LOCKDOWN
Nov 12, 2022 - SHORTAGE OF STAFF
Nov 13, 2022 - SHORTAGE OF STAFF
Nov 16, 2022 - FIGHT ON UNIT PLACED ON LOCKDOWN
Nov 17, 2022 - FIGHT ON UNIT PLACED ON LOCKDOWN
Nov 19, 2022 - SHORTAGE OF STAFF
Nov 24, 2022 - SHORTAGE OF STAFF
Nov 25,2022 - SHORTAGE OF STAFF
Nov 26,2022 - SHORTAGE OF STAFF
Nov 27, 2022 - SHORTAGE OF STAFF

MONTH OF DECEMBER - NO SHOWERS, PHONE, RECREATION
Dec 3, 2022 - SHORTAGE OF STAFF
Dec 4, 2022 - SHORTAGE OF STAFF
Dec 10, 2022 - SHORTAGE OF STAFF
Dec 11, 2022 - SHORTAGE OF STAFF - OUT FOR 2 HOUR

Dec 17, 2022 - SHORTAGE OF STAFF
Dec 18,2022 - SHORTAGE OF STAFF
Dec 24, 2022 - SHORTAGE OF STAFF - OUT FOR 2 HOURS
Dec 25, 2022 - SHORTAGE OF STAFF
Dec 30, 2022 - SHORTAGE OF STAFF
Dec 31, 2022 - SHORTAGE OF STAFF

MONTH OF JANUARY - NO SHOWERS, PHONE, RECREATION
Jan 1, 2023 - SHORTAGE OF STAFF
Jan 7, 2023 - SHORTAGE OF STAFF
Jan 8, 2023 - SHORTAGE OF STAFF
Jan 9, 2023 - my unit has been placed on a $20 commisary spending limit due to phones and contraband being found for 90
days.
Jan 14, 2023 - SHORTAGE OF STAFF
Jan 15, 2023 - SHORTAGE OF STAFF
Jan 21, 2023 - SHORTAGE OF STAFF - OUT FOR 2 HOURS
Jan 22, 2023 - SHORTAGE OF STAFF
Jan 28, 2023 - SHORTAGE OF STAFF
Jan 29, 2023 - SHORTAGE OF STAFF

MONTH OF FEBUARY - NO SHOWERS, PHONE, RECREATION
Feb 4,2023 - SHORTAGE OF STAFF
Feb 5, 2023 - SHORTAGE OF STAFF
Feb 11, 2023 - SHORTAGE OF STAFF
Feb 12, 2023 - SHORTAGE OF STAFF - OUT FOR 2 HOURS
Feb 18, 2023 - SHORTAGE OF STAFF
Feb 19, 2023 - SHORTAGE OF STAFF
Feb 25,2023 - SHORTAGE OF STAFF
Feb 26, 2023 - SHORTAGE OF STAFF

MONTH OF MARCH - NO SHOWERS, PHONE, RECREATION
Mar 4, 2023 - SHORTAGE OF STAFF
Mar 5, 2023 - SHORTAGE OF STAFF
Mar 11, 2023 - SHORTAGE OF STAFF
Mar 12, 2023 - SHORTAGE OF STAFF - OUT FOR 2 HOURS
Mar 18, 2023 - SHORTAGE OF STAFF
Mar 19,2023 - SHORTAGE OF STAFF

March 22, 2023 jail put on lockdown to, to many phones homemade knifes and contraband being found with been going on
since I've been in this facility.

Mar 25, 2023 - 15 MINUTE SHOWERS NO PHONE NO RECREATION
Mar 28, 2023 - 15 MINUTE SHOWERS NO PHONE NO RECREATION

Mar 29, 2023 jail put on modified lockdown 15 cells out at a time for 1 and a half hours until 4/3/2023 per warden

MONTH OF APRIL - NO SHOWERS, PHONE, RECREATION.
Apr 3, 2023 cutting on my unit put on lockdown
Apr 5, 2023 half unit out for 3 hours then the other half came out for 3 hours
Apr 8, 2022 out for 1 and a half hours
Apr 9, 2022 out for 1 and a half hours
Apr 10,2023 half unit out for 3 hours then other half of unit came out for 3 hours
Apr 11, 2023 out for 1 and a half hours
Apr 12, 2023 out for 1 and a half hours

# EXHIBIT D

*USA v Eric Bolton*

22-Cr-330 (KMK)

Completion Certificates

# COLUMBIA UNIVERSITY

## IN THE CITY OF NEW YORK

*This Certifies That*

# Eric Bolton

*has successfully completed a Mini-course in Orphicates offered by the*

*Justice-in-Education Initiative and the Rethinking Justice Initiative and in testimony thereof is awarded this*

# Certificate of Completion

*Conferred in the City of New York on this*

*Fifth day of August in the year Two Thousand Twenty-Two.*

_____
*Instructor*

_____
*Instructor*

# MDC Brooklyn
# Recreation Department



*This is to Certify that*

## Eric Bolton

*Has Successfully Completed*

### Sentry Diabetes and You Journal Course

*at MDC Brooklyn*

*This certificate is hereby issued this 25st day of June 2022*

**D. Ranalli**

*Recreation Specialist*

# U.S. Department of Justice
## Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

*Eric Bolton*



**Business Acumen**

*Corporate Skills Training Program provided by the
Education Department at MDC Brooklyn*

*A. Delgado*

A. Delgado- Education Specialist

March 9, 2023

# U.S. Department of Justice
## Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to



*Eric Bolton*

**Time Management**

*Corporate Skills Education Program provided by the*
*Education Department at MDC Brooklyn*

*A. Delgado*

A. Delgado- Education Specialist

March 3, 2023





# U.S. Department of Justice
## Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

*Eric Bolton*

**Leadership & Influence**

*Corporate Skills Training Program provided by the
Education Department at MDC Brooklyn*



A. Delgado- Education Specialist

March 3, 2023



## U.S. Department of Justice
### Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

*Eric Bolton*

**Developing Creativity**

*Corporate Skills Training Program provided by the Education Department at MDC Brooklyn*



*A. Delgado*

A. Delgado– Education Specialist

March 1, 2023



# U.S. Department of Justice
## Federal Bureau of Prisons

# Certificate of Completion

This certificate is presented to

*Eric Bolton*

**The Ten Soft Skills You Need**

*Corporate Skills Training Program provided by the Education Department at MDC Brooklyn*



A. Delgado- Education Specialist

March 1, 2023





# MDC Brooklyn
## Recreation Department



*This is to Certify that*

## Eric Bolton

*Has Successfully Completed:*

### CHESS 2-Sentry Course

*At MDC Brooklyn*

*This certificate is hereby issued this 26th day of December 2022*

## D. Ranalli

*Recreation Specialist*

# MDC Brooklyn
# Recreation Department



This is to Certify that

*Eric Bolton*

Has Successfully Completed:

**CHESS–Sentry Course**

At MDC Brooklyn

This certificate is hereby issued this 8th day of November 2022

*D. Ranalli*

Recreation Specialist

# EXHIBIT E

*USA v Eric Bolton*

22-Cr-330 (KMK)

<u>Letters</u>

Jarvis Humphries, Basketball Coach
Janet Lamar, Sister
Linda Smith, Family Friend

Jarvis Humphries

████████████████

Fishkill NY 12524

████████████████

Honorable Kenneth N. Karas
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

Re: <u>USA v. Eric Bolton</u>

June 8, 2023

To Judge Karas:

My name is Jarvis Humphries I was Eric Bolton's basketball coach at the Kiley Youth Center in Peekskill New York. I met Eric when he was just eight years old, he joined the team that I coached as a bonding experience for my kids. He was focused, dedicated and eager to play and learn the ins and outs of the sport. His eagerness to be the best he could be was an attribute that stood out to me. As time went on, I continued to understand who Eric was, through his gentle, protective, and comedic ways. Eric became more than a teammate; he became a part of my family.

Family was something Eric was lacking and longed for, there was a lot of emotional abuse, negligence, very little guidance and barely any support. When Eric was in the third grade, I received a call from his teacher asking if I could meet with him, he explained that there was a reason for concern for Eric, he went on to tell me that a group of his students who were also on the basketball team, highly recommended that he calls me and provided him with my number. When I arrived at the school the following day, the teacher explained to me that Eric had been wearing the same clothes for three days, he said that Eric told him that he was locked out of the house. After that meeting I was deeply saddened by this revelation and was understanding of Eric's situation. I discussed what transpired with my wife and we agreed to offer our home to him if he needed it. Eric came to live with us for a total of five years, he was provided a structured environment, he had both a mother and father figure and was eager to maintain his new lifestyle. The opportunity presented to Eric, made him want to keep his new safe haven, and worked hard to obtain normalcy in his life. As he got older there was a different level of wants that he never

thought of before, he began to set goals in school and worked hard to attain them as he wanted a normal High School Diploma and did not wish to be labeled as a Special Ed. student. He was adamant about being a good influence on the younger kids, teaching them skillsets he learned, displaying hard work and dedication to his assistant coach duties as well as all other assigned duties at the Kiley center. There was never any push back or laziness, he wanted to do good and that is all you could ask for from a kid with his background. I noticed that he began to take ownership of his life, setting goals, dreaming for bigger and better things, I saw that there was more to him, and I knew with the right support he could do anything he set his mind to, to better him and his future life, knowing this made my wife and I find comfort in the decision we made to help him. As time went on, I noticed a lacking in him, Eric was home sick and yearned for his biological family which consisted of a single mother, brother, and sister. My wife and I always stressed that this is voluntary, we never wanted him to feel forced into living with us, we gave him the option to go back, and he did.

As a coach, father, and father figure to many, I have always made the biggest effort to show the benefits of hard work and determination. The young man who once lived in my home, played the role of big brother to my children and the same person who was eager to put in the work, has the same morals and values engrained in him. It was both troubling and surprising to find out his current situation. In past conversations, Eric has expressed the importance of being both present and active in his son's life. Like me, he wants to be there to coach him through the ups, downs, and pitfalls of life.

Your honor this is a man of substance, who wants to love as he has never been loved by his own, he has suffered from severe abandonment and has fallen victim to his environment in order to survive. It is my sincere hope that the court takes this letter into consideration at the time of sentencing. Despite the current case, I still believe Eric to be an honorable individual, a valued member of my community and good human being.

Thank you for consideration,

Very truly yours

Jarvis Humphries

The Honorable Kenneth M Karas
United States District Judge
Southern District of New York
300 quarropas St
White Plains NY 10601

Re: USA V Eric Bolton

Dear Judge Karas,
   I am Janet Lamar the sister of
Eric Bolton. I am the 2nd
oldest out of 5 of us. I am
36 years old and my occupation
is nursing. Out of all my
siblings Eric is the most
honest, loving, caring, hardworking
family orientated one. He has
always been this way even
as a kid He is always some-
one I can call on and
rely on for anything. He Eric
has been there so many
times for my children and
I. Eric is also a caregiver
to our sick mother. Even
though i have been doing
nursing for 15 plus years

he has more patience with
our mother. We also have
alot of elderly aunts that
he helps out with. He is
very active and hands on
in our family. He is also
a loving father his son
loves the ground his father walks
on. I ask as his sister
judge to please impose a
lenient sentence as possible
because my sick mother
needs him and so do his son.
He has did some bad things
and made some messed up
choices bout his good definitely
out weight his bad.

Signed his
Sister
Janet Lamey

Good Evening,

This is a character reference letter for Eric Bolton

My name is Linda Smith and proud to offer my recomendation of Eric Bolton to whom I have personally known for 30+ years as a Close friend of the family.

During my relationship with Eric Bolton, i have experienced an individual who has always given a helping hand when needed, works hard and is determined, and has always carried himself in a poite, respectable manner, as well has shown and treated others with respect and compassion. In addition Eric Bolton is and has always been a family oriented person who has presented himself with levelheadedness and grace. He is always willing to give even when he does not have it nor does not turn down helping out someone when given the chance.

If you have any other question please do not hesitate to contact me should you require any further information regarding Mr. Bolton. My Contact Information is listed below.

Linda Smith

Peekskill, Ny 10566

# EXHIBIT F

*USA v Eric Bolton*

22-Cr-330 (KMK)

NYS Corrections and Community Supervision Directive
Shock Incarceration Facilities

| NEW YORK STATE | Corrections and Community Supervision | TITLE | NO. 0086 |
|---|---|---|---|
| | | **Shock Incarceration Facilities** | DATE 07/29/2021 |
| | **DIRECTIVE** | | |

| SUPERSEDES | DISTRIBUTION | PAGES | DATE LAST REVISED |
|---|---|---|---|
| DIR# 0086 Dtd. 03/18/19 | A B | PAGE 1 OF 3 | |

| REFERENCES (Include but are not limited to) 7 NYCRR Chapter XI, Part 1800; Correction Law 2(20); Penal Law Articles 70, 125, 130, 205 | APPROVING AUTHORITY *[signature]* |
|---|---|

I. **DESCRIPTION**:  The New York State Department of Corrections and Community Supervision (DOCCS) administers a Shock Incarceration Program.  This program provides selected incarcerated individuals a special six-month program of shock incarceration, stressing a highly structured routine of discipline, intensive regimentation, exercise, and work therapy, together with substance abuse treatment, education, pre-release counseling, and life skills counseling.

II. **FACILITIES**

    A. This program is to be conducted at the following Shock Incarceration Correctional Facilities:

        1. Lakeview - located near Brocton in Chautauqua County.

        2. Moriah - located near Mineville in Essex County.

    B. Moriah Shock Incarceration Correctional Facility shall be used for males 18 years of age or older and classified as minimum security for purposes of shock incarceration.

    C. Lakeview Shock Incarceration Correctional Facility shall be used for both males and females 18 years of age or older and shall encompass two separate security components:

        1. Medium security for purposes of shock incarceration.

        2. Maximum security to serve as a special housing unit alternative Program (SHU-Alt), Intensive Alcohol and Substance Abuse Training (I-ASAT).  The SHU-Alt I-ASAT Program is a single-cell program for incarcerated individuals who are serving disciplinary sanctions for substance abuse related offenses and are at high risk for continued drug and alcohol abuse.

III. **SELECTION**

    A. All incarcerated individuals whose time, crime(s) of conviction, and age meet the minimum eligibility requirements for consideration for participation in shock incarceration and are deemed suitable shall be sent to Lakeview Shock Incarceration Correctional Facility, unless one of the following conditions exist:

        1. The incarcerated individual is classified as maximum security.

        2. The incarcerated individual's mental health level is 1 or 2.

3. The incarcerated individual is found to have a serious medical problem which automatically precludes their participation in the program. Any incarcerated individual deemed not appropriate due to a serious medical condition will be referred to Central Office Health Services for review.

4. Incarcerated individuals who are Court-Ordered Shock with above conditions 2 or 3 will be afforded an alternative placement so they may complete the Shock Incarceration Program.

B. Eligible incarcerated individuals may make application to the Shock Incarceration Selection Committee for permission to participate in the program.

C. If the Selection Committee determines that an incarcerated individual's participation in the program is consistent with the safety of the community, the welfare of the applicant, and the selection criteria for the program, the Committee shall forward the application to the Commissioner, or designee, for approval or disapproval.

## IV. ELIGIBILITY

A. An incarcerated individual may apply for participation in the Shock Incarceration Program if they:

1. Are at least 18 but less than 50 years of age.

2. Are sentenced to an indeterminate term of imprisonment and will become eligible for release on parole within three years or are sentenced to a determinate term of imprisonment and will become eligible for conditional release within three years.

3. Were between 18-49 years of age at the time of the commission of the crime.

4. Have not previously been convicted of a violent felony in New York as defined in Article 70 of the Penal Law or a felony in any other jurisdiction which includes all of the essential elements of any such violent felony, upon which an indeterminate or determinate term of imprisonment was imposed.

B. Notwithstanding the foregoing, no person who is convicted of any of the following crimes shall be deemed eligible to participate in this program:

1. A violent felony offense.

2. An A-1 felony offense.

3. Any homicide offense as defined in Article 125 of the Penal Law.

4. Any felony sex offense as defined in Article 130 of the Penal Law.

5. Any escape or absconding offense as defined in Article 205 of the Penal Law.

C. Outstanding Warrants, Commitments, Open Charges, or Immigration Status: The Shock Incarceration Selection Committee shall examine each incarcerated individual's record to determine whether the incarcerated individual has any of the following detainers, warrants, or commitments outstanding, which, in the discretion of the Committee, may bar the incarcerated individual from participation in the Shock Incarceration Program:

1. Criminal related detainer or warrant.

2. Bail warrant.

3. Immigration warrant.

4. Probation warrant or out-of-state parole warrant.

5. Concurrent or consecutive out-of-state or federal commitments.

D. The incarcerated individual must be medically and psychologically fit to participate in the Shock Incarceration Program. The fitness of the incarcerated individual shall be assessed by DOCCS and/or the Office of Mental Health professionals. The Committee shall consider the health professional's assessment in recommending whether the incarcerated individual be approved for program participation. Subsequent medical or psychological unfitness may result in temporary or permanent removal from the program.

NOTE: An otherwise eligible incarcerated individual shall be deemed ineligible for the Shock Incarceration Program if they agreed not to apply for, or waived participation in, this program as a condition of pleading guilty to the instant offense. The incarcerated individual's agreement to such condition may be established by the court commitment, the sentencing minutes, the pre-sentence report, or a separate written communication from the office of the district attorney or the sentencing court that is sent to the Department. If an incarcerated individual is allowed to enter the Shock Incarceration Program, but thereafter it is learned that they previously agreed not to apply for, or waived participation in, this program as a condition of the plea bargain, they will be immediately removed from this program. The Office of Sentencing Review should be consulted in any situation where it is unclear as to whether such a condition was a part of the negotiated plea.

V. **PHYSICAL ENVIRONMENT**: General population housing consists of dormitories. Special housing consists of single cells.

VI. **REMOVAL FROM PROGRAM**: Participation in the Shock Incarceration Program is a privilege, not a right. No incarcerated individual has the right to participate, or to continue to participate, in the program.

# EXHIBIT G

*USA v Eric Bolton*

22-Cr-330 (KMK)

Declaration of Richard Willstatter

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------x
UNITED STATES OF AMERICA,

    -v.-

                               22 Cr. 330 (KMK)

ERIC BOLTON,

        Defendant.
----------------------------------------------------x

## Declaration

    Richard D. Willstatter, an attorney admitted to practice in this District, hereby declares the following is true:

1. I was initially assigned to represent Eric Bolton in connection with charges filed against him in 2016, S1 16 Cr. 372 (VEC).

2. On April 18, 2022, I was assigned to represent Mr. Bolton in connection with a violation of supervised release filed against him. One of the specifications was the claim that he possessed a firearm as a convicted felon. The report claimed a search was conducted at the home of Ashley Johnston, Eric's girlfriend, and was found in a laundry basket or hamper next to their bed. After meeting with Mr. Bolton, I spoke to Ms. Johnston, telling her that I understood she had acquired the gun because she was a witness in a federal criminal case at which she had recently testified at the U.S. Courthouse in White Plains. She said she was afraid of the defendant in that case and that the federal prosecutor had promised to, but did not, relocate her before the trial. She was afraid of of the man against whom she testified and his confederates who she said were on the street around her Yorktown Heights home. She said she was afraid she would go to jail if she was to admit she had the gun.

3.    On April 19, 2022, at 2:45 p.m., I received a text message from Ms. Johnston that read,

"This is Eric Bolten [sic] girl friend Ashley Johnston he called me and told me he has

court on the 28th. I just wanna discuss some options before that. Please call when you are

free. I am off tomorrow you can call anytime." In response, I called her that afternoon

while I was driving. She told me that the gun was hers, that is that she owned it, and that

she got it because she was afraid of the man against whom she had testified in court. She

said she had been threatened on social media, that someone had broken her windshield,

and that very recently someone had punctured one of her tires. She said the prosecutor,

AUSA Shiva Logarajah, had promised to protect her, but he didn't. I explained that I was

not her lawyer but since she was not a convicted felon, it was unlikely the federal

government could prosecute her for the firearm, but it could be a state crime, and so she

should ask for the appointment of counsel before speaking to law enforcement about her

possession of the gun.

4.    I then called the prosecutor, Olga Zverovich, and told her that Ashley Johnston had

admitted to me that the gun was hers. I added that I was aware that more than one person

can possess contraband simultaneously and that Johnston did not tell me that she had

personally acquired the gun. I was careful not to relate anything I learned from my client.

But I thought this information was favorable if not exculpatory and asked the government

to look into it. I suggested that Ms. Johnston should be appointed counsel before being

questioned.

5.    On May 3, 2022, AUSAs Simon and Zverovich spoke with me to review these facts.

6.    On May 16, 2022, I received a complaint that was filed against Mr. Bolton alleging a

violation of 18 U.S.C. 922(g), filed as *United States v. Eric Bolton*, 22 MJ 4395, in which

the government attributes statements to a witness. I understood that witness was Ms. Johnston.

7.      On May 19, 2022, I filed a motion to Judge Caproni asking to be relieved as counsel because it appeared I could be a witness for Eric Bolton as Ms. Johnston had made statements to me about the firearm in question that contradict the statements described in the complaint. I was relieved by order of Judge Karas on July 8, 2022.

8.      I declare pursuant to 28 U.S.C. 1746 under penalty of perjury that the foregoing is true and correct.

Dated:      June 24, 2023
             White Plains, New York

                           Respectfully,

                           /s/ Richard D. Willstatter
                           RICHARD D. WILLSTATTER