UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                          :

UNITED STATES OF AMERICA            :
                                                           :

        - v -               :

                                                           :     22 Cr. 330 (KMK)

                                                           :

ERIC BOLTON,                      :
                                                           :

                    Defendant.     :

                                                           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN
OPPOSITION TO THE DEFENDANT'S MOTION TO DISMISS**

                                       DAMIAN WILLIAMS
                                         United States Attorney
                                         Southern District of New York
                                         50 Main Street, Suite 1100
                                         White Plains, New York 10606




Stephanie Simon
Assistant United States Attorney
    *Of Counsel*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ..................................................................................................... 1

ARGUMENT ......................................................................................................... 2

   I.   SECTION 922(G)(1) IS CONSTITUTIONAL AS APPLIED TO BOLTON ................... 3

  II.  SECTION 922(G)(2) IS CONSTITUTIONAL ON ITS FACE ................................ 5

      A.  *Bogle*, *Heller*, and *McDonald* All Confirm the Constitutionality of Section 922(g)(1)'s Prohibition on Felons' Possession of Firearms ........................................ 5

      B.  *Bruen* Does Nothing to Undermine Section 922(g)(1) or *Bogle* .................. 7

      C.  Text and History Confirm that Section 922(g)(1) Is Consistent with the Second Amendment ..................................................................................... 9

          1.  The Text of the Second Amendment and Its Historical Context Make Plain that the Defendant, a Convicted Felon, Cannot Mount a Successful Attack on Section 922(g)(1) ............................................................................... 9

          2.  Historical Tradition Confirms that Section 922(g)(1) Is Consistent withThis Nation's Historical Tradition of Firearms Regulation ........................................... 13

CONCLUSION ..................................................................................................... 22

# **TABLE OF AUTHORITIES**

**Federal Cases** **Page(s)**

*Baze v. Rees*, 553 U.S. 35 (2008) ............................................................ 20

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................................ *passim*

*Folajtar v. Attorney General*, 980 F.3d 897 ............................................... 20

*In re United States*, 578 F.3d 1195 (10th Cir. 2009) ..................................... 4

*Libertarian Party of Erie Cty. v. Cuomo*, 970 F.3d 106 (2d Cir. 2020) ..................... 13

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ........................................ 3

*Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir.) ............................................. *passim*

*N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525 .............. 7, 8

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ........ 1, 2

*Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013) ....................................... 6

*Spencer v. Kemna*, 523 U.S. 1 ............................................................ 11

*Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678 (6th Cir. 2016) (en banc) ........ 11

*United States v. Anderson*, 559 F.3d 348 (5th Cir. 2009) ................................. 6

*United States v. Barton*, 633 F.3d 168 (3d Cir. 2011) .................................... 6

*United States v. Bena*, 664 F.3d 1180 (8th Cir. 2011) .................................... 12

*United States v. Bogle*, 717 F.3d 281 (2d Cir. 2013) (per curiam) ........................ 3, 4, 8

*United States v. Carey*, 602 F.3d 738 (6th Cir. 2010) .................................... 6

*United States v. Carpio-Leon*, 701 F.3d 974 ............................................. 11-12

*United States v. Decastro*, 682 F.3d 160 (2d Cir. 2012) .................................. 13

*United States v. Hampton*, 2023 WL 3934546 (S.D.N.Y. June 9, 2023) ....................... 9

*United States v. Jackson*, 69 F.4th 495 (8th Cir. 2023) .................................. 4

*United States v. Jimenez*, 895 F.3d 228 (2d Cir. 2018) ................................... 13, 6

*United States v. Joos*, 638 F.3d 581 (8th Cir. 2011) ..................................... 6

*United States v. King*, 2022 WL 5240928 .................................................................. 9

*United States v. Massey*, 849 F.3d 262 (5th Cir. 2017) ................................................ 4

*United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009) .......................................... 6

*United States v. Moore*, 666 F.3d 313 ......................................................................... 6

*United States v. Peguero*, 34 F.4th 143 (2d Cir. 2022) ................................................ 8

*United States v. Perez*, 6 F.4th 448 (2d Cir. 2021) ...................................................... 16

*United States v. Roszkowski*, 700 F.3d 50 (1st Cir. 2012) ........................................... 6

*United States v. Rowson*, 2023 WL 431037 (S.D.N.Y. Jan. 26, 2023) ........................ 18

*United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010) ............................................... 4

*United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010) ...................................... 12, 6

*United States v. Wilkerson*, 361 F.3d 717 (2d Cir. 2004) ............................................ 8

*United States v. Williams,* 616 F.3d 685 ...................................................................... 6

*United States v. Yancey*, 621 F.3d 681 ........................................................................ 12

**Federal Statutes**

18 U.S.C. § 922 ....................................................................................... *passim*

18 U.S.C. § 924 ..................................................................................................... 1, 5

21 U.S.C. § 846 ..................................................................................................... 1, 5

**Constitution**

U.S. Const. amend. II ................................................................................................. 10

**Other**

*Beth A. Colgan, Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277 & nn.275 ............. 21

*Possessing Arms*, 20 Wyo. L. Rev. 249 (2020) .......................................................... 16

## PRELIMINARY STATEMENT

In his sentencing submission (ECF No. 25 ("Def. Mem.")), defendant Eric Bolton argues that 18 U.S.C. § 922(g)(1) is unconstitutional as applied to him under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), and requests that his conviction under that statute be voided as a result. *See* Def. Mem. 2-5. That request is meritless. The Second Circuit has already upheld Section 922(g)(1) against a facial challenge, and *Bruen* does nothing to undermine that binding decision. Moreover, even if the Court were to reanalyze the constitutionality of Section 922(g)(1) under *Bruen*, the historical evidence amply supports Congress's ability to prohibit convicted felons—in particular those like Bolton, with multiple prior narcotics and weapons convictions—from possessing firearms.

## BACKGROUND

On or about March 6, 2017, the defendant pled guilty in this District to a two-count Information charging conspiracy to distribute and possess with intent to distribute crack cocaine and MDMA, in violation of 21 U.S.C. § 846, and possession of a firearm arm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c). *See United States v. Eric Bolton*, 16 Cr. 372 (S.D.N.Y.) (the "Prior Federal Case"). On or about June 13, 2018, the defendant was sentenced to time served, which resulted in approximately 26 months' imprisonment, to be followed by five years' supervised release. *See id.*, ECF No. 203. Among the terms of the defendant's supervised release was the condition (the "Search Condition") that the defendant submit his person, residence, and any property under his control to a search on the ground that Probation has reasonable suspicion that contraband or evidence of a violation of the conditions of supervised release may be found. The defendant's term of supervised release began on June 13, 2018, and was set to expire on June 12, 2023.

On or about April 18, 2022, while still on supervised release in connection with the above-referenced offense, Probation conducted a search of the apartment where Bolton had been staying, pursuant to the Search Condition. During the search, Probation found—inside a hamper in the bedroom Bolton shared with his girlfriend—a grey backpack; inside the backpack, Probation found, among other things, a debit card in Bolton's name, a set of false teeth belonging to Bolton, and a loaded firearm, later determined to be a Taurus G2S 9mm handgun. Bolton was not permitted to possess that firearm, because he has numerous prior felony convictions, including the conviction in the Prior Federal Case.

On or about June 13, 2022, Bolton was charged by indictment (the "Indictment") with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). On or about March 22, 2023, Bolton appeared before the Hon. Judith C. McCarthy, U.S.M.J., and pled guilty pursuant to a *Pimentel* letter to Count One of the Indictment. He is scheduled to be sentenced on July 16, 2023.

## **ARGUMENT**

The defendant seeks to dismiss Count One of the Indictment on the theory that Section 922(g)(1) is unconstitutional as applied to him under the Supreme Court's recent decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). The defendant is incorrect. As an initial matter, the weight of authority suggests that an as-applied challenge is not appropriate under Section 922(g)(1), and nothing in *Bruen* changes that. Further, even if an as-applied challenge were theoretically appropriate in this context, Section 922(g)(1) is constitutional as applied to individuals, like Bolton, who have multiple prior narcotics, weapons, and violence convictions.

To the extent Bolton's request to dismiss Count One of the Indictment is construed as a facial challenge to Section 922(g)(1), that effort fails as well. The Second Circuit has upheld

Section 922(g)(1) against facial challenge—a decision that *Bruen* does nothing to undermine—and there is no support for the defendant's argument that a felon convicted of weapons, narcotics, and violence offenses has a Second Amendment right to possess firearms or ammunition. Instead, consistent with the Supreme Court's repeated statements about the constitutionality of prohibitions on the possession of firearms by felons, and pursuant to the Second Circuit's holding on this very matter, Section 922(g)(1) is constitutional on its face.

## I. SECTION 922(G)(1) IS CONSTITUTIONAL AS APPLIED TO BOLTON

The defendant argues that Section 922(g)(1) is unconstitutional as applied to him because his prior convictions are not crimes of violence. *See* Def. Mem. 2-5. His claim fails on multiple grounds.

As an initial matter, the weight of authority suggests that Section 922(g)(1) is not subject to an as-applied Second Amendment challenge. The Supreme Court has reiterated, time and again, that its decisions interpreting the Second Amendment "d[o] not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). Following *Heller* and *McDonald*, the Second Circuit held that Section 922(g)(1) is constitutional in all its applications under the Supreme Court's Second Amendment jurisprudence. *United States v. Bogle*, 717 F.3d 281, 282-83 (2d Cir. 2013) (per curiam).

More recently, in *Bruen*, the Supreme Court held that certain requirements for obtaining a license to carry a concealed firearm violates the Second Amendment. *See* 142 S. Ct. at 2122. As discussed in further detail below, however, the *Bruen* Court did not cast doubt on the constitutionality of prohibitions on the possession of firearms by felons, *see infra* pp. 7-9; to the contrary, the constitutionality of such prohibits was explicitly reaffirmed, *see id.* at 2162 (Kavanaugh, *J.*, concurring) (confirming that the Supreme Court's most recent decision—in

*Bruen*—specifically allows the "longstanding prohibitions on the possession of firearms by felons" blessed in *Heller* and *McDonald*).

Post-*Bruen*, at least one Courts of Appeals has concluded that Section 922(g)(1) is constitutional in all of its applications, thus foreclosing as-applied challenges. *See United States v. Jackson*, 69 F.4th 495, 502 (8th Cir. 2023) (concluding, after *Bruen*, "that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)"). Although the Second Circuit has yet to address the issue post-*Bruen*, the Court in *Bogle* clearly held that Section 922(g)(1) was constitutional on its face, and other Circuits have suggested that an individualized inquiry is not required. *See Bogle*, 717 F.3d at 281; *see also, e.g.*, *United States v. Massey*, 849 F.3d 262, 265 (5th Cir. 2017) (rejecting as-applied challenge without analyzing specific prior felony conviction); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) (*Heller* "suggests that statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment"); *In re United States*, 578 F.3d 1195, 1200 (10th Cir. 2009) ("We have already rejected the notion that *Heller* mandates an individualized inquiry concerning felons pursuant to § 922(g)(1).").

Only one Court of Appeals has upheld an as-applied Second Amendment challenge to Section 922(g)(1) following *Bruen*. In *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc), the Third Circuit held that Section 922(g)(1) is unconstitutional "only as applied to [the defendant in that case] given his violation of [a Pennsylvania offense prohibiting the making of false statements to obtain food stamps] … [b]ecause the Government has not shown that our Republic has a longstanding history and tradition of depriving people like [the defendant] of their firearms." *Id.* at 106. In so holding, the Court emphasized that its decision was a "narrow" one

dependent on the specific Pennsylvania statute under which the defendant had been previously convicted. *Id.*

*Range* is unpersuasive and should not be followed because Section 922(g)(1) is constitutional on its face under the *Bruen* framework, as the discussion below demonstrates. *See infra* pp. 10-22. Further, that out-of-Circuit decision does not, and cannot, disturb *Bogle*, which remains binding authority in this District for the reasons discussed below. *See infra* pp.7-9. In any event, even if the court were to engage in the historical analysis suggested by *Range*, Bolton would not benefit from the Third Circuit's outlier decision. Bolton has multiple narcotics and weapons convictions, including a conviction in this District for narcotics conspiracy, in violation of 21 U.S.C. § 846, and for possession of a firearm in furtherance of that drug trafficking crime, in violation of 18 U.S.C. § 924(c), as well as a robbery conviction, which is a crime of violence (contrary to the defendant's characterization of his own prior convictions). Therefore "this Nation's historical tradition of firearm regulation" supports depriving Bolton of his right to bear arms. *Bruen*, 142 S. Ct. at 2126.

## II. SECTION 922(G)(2) IS CONSTITUTIONAL ON ITS FACE

The defendant does not appear to raise a facial challenge to Section 922(g)(1). But to the extent the defendant does challenge the constitutionality of Section 922(g)(1) on its face, that claim fails under the Supreme Court's Second Amendment jurisprudence, decisions of the Second Circuit and other Courts of Appeals applying that jurisprudence, and the text and history of Section 922(g)(1).

### A. *BOGLE*, *HELLER*, AND *MCDONALD* ALL CONFIRM THE CONSTITUTIONALITY OF SECTION 922(G)(1)'S PROHIBITION ON FELONS' POSSESSION OF FIREARMS

In *Heller*, the Supreme Court held that the Second Amendment protects "the right of *law-abiding*, responsible citizens" to possess a handgun in the home for self-defense. 554 U.S. at 635

5

(emphasis added). The Court emphasized that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 626; *see also id.* at 631 ("Before this Court petitioners have stated that 'if the handgun ban is struck down and respondent registers a handgun, he could obtain a license, assuming he is not otherwise disqualified,' by which they apparently mean if he is *not a felon* and is not insane.") (emphasis added)). Two years later, the Supreme Court extended *Heller* to state and local governments, while "repeat[ing] [the] assurances" that it "made ... clear" in *Heller* that its "holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *McDonald*, 561 U.S. at 786 (plurality) (quoting *Heller*, 554 U.S. at 626).

Following *Heller* and *McDonald*, and expressly incorporating as law their discussions ratifying "longstanding prohibitions on the possession of firearms by felons," the Second Circuit held that Section 922(g)(1) "is a constitutional restriction on the Second Amendment rights of convicted felons." *Bogle*, 717 F.3d at 281-82.*Bogle* remains good law and binding on this Court. *See*, *e.g.*, *United States v. Jimenez*, 895 F.3d 228, 233 (2d Cir. 2018) (citing *Bogle* as good law). Further, "[f]acial challenges to the statute's constitutionality have failed in every circuit to have considered the issue." *Medina v. Whitaker*, 913 F.3d 152, 155 (D.C. Cir.) (collecting cases), *cert. denied*, 140 S. Ct. 645 (2019).[1]

---

[1] After *Heller* and *McDonald*, every Circuit to consider a facial challenge to Section 922(g)(1) reached the same conclusion. *See*, *e.g.*, *United States v. Roszkowski*, 700 F.3d 50, 58 (1st Cir. 2012); *United States v. Barton,* 633 F.3d 168, 175 (3d Cir. 2011); *United States v. Moore*, 666 F.3d 313, 318-19 (4th Cir. 2012); *United States v. Anderson*, 559 F.3d 348, 352 (5th Cir. 2009); *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010); *United States v. Williams*, 616 F.3d 685, 693-94 (7th Cir. 2010); *United States v. Joos*, 638 F.3d 581, 586 (8th Cir. 2011); *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009); *Rozier*, 598 F.3d at 771; *Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013). *See also Bogle*, 717 F.3d at 281-82 ("We therefore join every other circuit to consider the issue in

## B. *BRUEN* DOES NOTHING TO UNDERMINE SECTION 922(G)(1) OR *BOGLE*

The argument that *Bruen* renders Section 922(g)(1) unconstitutional has no merit: It would require the Court to disregard not only *Heller* and *McDonald*, but also *Bruen* itself.

In *Bruen*, the Supreme Court held that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context;" rather, the "firearms regulation [must be] part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S. Ct. at 2127. Not only did *Bruen* reaffirm *Heller* and *McDonald*, but six justices took pains to emphasize that *Bruen* did nothing to upset *Heller*'s and *McDonald*'s reassurances that certain firearms regulations, such as prohibitions on the possession of firearms by felons, are constitutional. *See id.* at 2157 (Alito, *J.*, concurring) ("Nor have we disturbed anything that we said in *Heller* or *McDonald*…, about restrictions that may be imposed on the possession or carrying of guns."); *id.* at 2162 (Kavanaugh, *J.*, joined by Roberts, *C.J.*, concurring) ("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations," including the "longstanding prohibitions on the possession of firearms by felons" discussed in *Heller* and *McDonald* (quoting *Heller*, 554 U.S. at 626)); *id.* at 2189 (Breyer, *J.*, joined by Sotomayor and Kagan, *JJ.*, dissenting) ("I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding" permitting felons to be prohibited from possessing firearms).[2]

_____

affirming that § 922(g)(1) is a constitutional restriction on the Second Amendment rights of convicted felons.").

[2] In addition, just two years earlier, Justice Thomas and Justice Gorsuch agreed that *Heller* and *McDonald* "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals." *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1540-41 (2020) (Alito, *J.*, joined by Thomas and Gorsuch, *JJ.*, dissenting). Thus, eight of the nine members of the *Bruen* Court have explicitly approved of *Heller*'s and *McDonald*'s reassurances regarding felon-in-possession statutes.

Accordingly, nothing in *Bruen* undercuts *Bogle*. The Second Circuit did not employ means-end scrutiny in *Bogle*; rather, it applied *Heller* and *McDonald* to conclude that "recent developments in Second Amendment jurisprudence should not 'be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons.'" *Bogle*, 717 F.3d at 281 (quoting *Heller*, 554 U.S. at 626). And as the Supreme Court has repeatedly explained, including in *Bruen* itself, the reassurances in *Heller* and *McDonald* were supported by history. *Bruen*, 142 S. Ct. at 2128 (explaining that in *Heller*, the Court "relied on the historical understanding of the [Second] Amendment to demark the limits on the exercise of that right"); *City of New York*, 140 S. Ct. at 1540-41 (Alito, *J.*, joined by Thomas and Gorsuch, *JJ.*, dissenting) (explaining that *Heller* and *McDonald* "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals"); *Heller*, 554 U.S. at 626, 635 (acknowledging that "permissible" regulations, including the "longstanding prohibitions on the possession of firearms by felons," were supported by "historical analysis" and "historical justifications"). Thus, by following *Heller* and *McDonald*, the Second Circuit necessarily upheld Section 922(g)(1) because such a regulation is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. By reaffirming *Heller* and *McDonald*, and counseling courts to adhere more closely to those cases, *Bruen* therefore effectively reaffirmed *Bogle*, which drew directly from *Heller* and *McDonald*, and, in any event, did not overrule it. *See*, *e.g.*, *United States v. Peguero*, 34 F.4th 143, 158 (2d Cir. 2022) ("It is a longstanding rule that a panel of our Court is 'bound by the decisions of prior panels until such times as they are overruled either by an en banc panel of our Court or by the Supreme Court.'" (quoting *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004))).

Thus, as this Court and as other judges in this District have concluded, the clear reasoning of *Heller*, *McDonald*, and *Bruen* forecloses any argument that Section 922(g)(1) is facially unconstitutional. *See United States v. Patterson*, No. 19-cr-231 (CS) (S.D.N.Y. Sept. 9, 2022); *see also United States v. Hampton*, 2023 WL 3934546 (S.D.N.Y. June 9, 2023); *United States v. Garlick*, No. 22 Cr. 540 (VEC) (S.D.N.Y. Mar. 20, 2023); *United States v. Centeno*, No. 22-cr-542 (DLC) (S.D.N.Y. Feb. 6, 2023); *United States v. King*, 2022 WL 5240928, at *4-5 (S.D.N.Y. Oct. 6, 2022); *United States v. Adams*, No. 20-cr-628 (AKH) (S.D.N.Y. Aug. 10, 2022); *United States v. Maurice*, No. 22-cr-48 (VB) (S.D.N.Y. Jul. 14, 2022). These decisions join the Eighth Circuit and well over 100 district court decisions since *Bruen* that have upheld the constitutionality of Section 922(g)(1). *See, e.g.*, *Jackson*, 69 F.4th at 501-06; *Vincent v. Garland*, Br. for Defs.-Appellees 17 n.5, No. 21-4121 (10th Cir. Jan. 17, 2023) (collecting cases).

## C. TEXT AND HISTORY CONFIRM THAT SECTION 922(G)(1) IS CONSISTENT WITH THE SECOND AMENDMENT

### 1. The Text of the Second Amendment and Its Historical Context Make Plain that the Defendant, a Convicted Felon, Cannot Mount a Successful Attack on Section 922(g)(1)

Where the validity of a restriction is challenged, a court looks to "the Second Amendment's plain text," as informed by "this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. As a matter of both text and history, the Second Amendment does not prevent legislatures from prohibiting firearm possession by those who have demonstrated disregard for the rule of law through the commission of felony offenses—a conclusion reached by the D.C. Circuit before *Bruen* and the Eighth Circuit after *Bruen*. *See Jackson*, 69 F.4th at 505 (concluding that "legislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms" and that "Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons"); *Medina*, 913 F.3d at 157-61

("hold[ing] that those convicted of felonies are not among those entitled to possess arms" and "reject[ing] the argument that non-dangerous felons have a right to bear arms" based on "tradition and history," making it unnecessary to "reach the second"—now abrogated—"step" of that court's pre-*Bruen* precedent).

Felon disarmament laws are consistent with the Second Amendment's text, as historically understood. The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Felons do not fall within "the people" protected by the Second Amendment, and "the right ... to keep and bear Arms" is not "infringed" by longstanding laws prohibiting felons from possessing firearms due to their convictions.

The Amendment's protections extend to "ordinary, law-abiding, adult citizens," *Bruen*, 142 S. Ct. at 2134, who are entitled to be "members of the political community," *Heller*, 554 U.S. at 580. Section 922(g)(1) imposes a status-based restriction on who can possess firearms that reflects a longstanding recognition that individuals who commit crimes punishable by more than one year of imprisonment and are subject to disarmament laws on that basis are not "ordinary, law-abiding, adult citizens," *Bruen*, 142 S. Ct. at 2134, who are "members of the political community," *Heller*, 554 U.S. at 580.

Consistent with that understanding, legislatures historically have had wide latitude to exclude felons from the political community as a consequence of their convictions. As Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitations," *Heller*, 554 U.S. at 616, "the *people* in whom is vested the sovereignty of the State ... cannot include the whole population," and "[c]ertain classes have been almost universally excluded"—including "the idiot, the lunatic, and the felon, on obvious grounds." Thomas M. Cooley, *A Treatise on the*

*Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868). Felons could therefore historically be excluded from "exercis[ing] the elective franchise," *id.* 29, as well as from other, closely related "political rights"—including the rights to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms," Akhil Reed Amar, *The Bill of Rights* 48 & n.* (1998) (explaining that these were all historically understood as "political rights" and that in particular, "arms bearing and suffrage were intimately linked [in the late eighteenth century] and have remained so").

It remains the case that the commission of a felony often results in the "forfeiture of a number of rights" tied to membership in the political community, including not just the right to bear arms but also "the right to serve on a jury and the fundamental right to vote." *Medina*, 913 F.3d at 160 (citing 28 U.S.C. § 1865(b)(5) (barring convicted felons from serving on a federal jury); *Richardson v. Ramirez*, 418 U.S. 24, 56 (1974) (upholding state felon disenfranchisement)); *see also Spencer v. Kemna*, 523 U.S. 1, 8-9 (1998) (noting that consequences of a felony conviction can include deprivation of the right to hold office).

Just as Congress and the States have required persons convicted of felonies to forfeit other rights belonging to members of the political community, Section 922(g)(1) accords with the historical meaning of the Second Amendment by imposing a firearms-related disability "as a legitimate consequence of a felony conviction," *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 708 (6th Cir. 2016) (en banc) (Sutton, J., concurring in most of the judgment). While "[t]he Second Amendment establishes a fundamental right for American citizens to possess a gun," the decision in "*Heller* recognizes an exception for some Americans—to respect 'longstanding prohibitions on the possession of firearms by felons and the mentally ill,'" exceptions that are "historically grounded and sensible." *Id.* (quoting *Heller*, 554 U.S. at 626); *see also, e.g., United*

*States v. Carpio-Leon*, 701 F.3d 974, 979-80 (4th Cir. 2012); *United States v. Bena*, 664 F.3d 1180, 1183 (8th Cir. 2011); *United States v. Yancey*, 621 F.3d 681, 684-85 (7th Cir. 2010) (per curiam); *Vongxay*, 594 F.3d at 1118.

*Bruen* makes particularly plain that those who are not law-abiding cannot successfully challenge laws that apply to them based on that status. The Supreme Court made "repeated statements in *Bruen* that the Second Amendment protects the right of a 'law-abiding citizen' to keep and bear arms." *Jackson*, 69 F.4th 503 (collecting citations to *Bruen*). In one passage, the Court connected its explanation that the plaintiffs were "part of 'the people' whom the Second Amendment protects" with its observation that they were "ordinary, law-abiding, adult citizens." *Bruen*, 142 S. Ct. at 2134. In another passage, *Bruen* approved "shall-issue" licensing regimes, explaining that such regimes "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Id.* at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). In another passage, *Bruen* explained the historical analysis focuses on "how and why" a challenged regulation and a potential analogue each "burden a *law-abiding* citizen's right to armed self-defense." *Id.* at 2133 (emphasis added). Applying that historical test as the Court has described it would be superfluous where, as here, the challenged law applies only to those who are not law-abiding—and thus does not impose *any* "burden" on "a law-abiding citizen's right to armed self-defense." *Id.*

That non-law-abiding citizens can be disarmed under a proper understanding of the constitutional text also explains the Court's specific assurances regarding the permissibility of prohibitions on the possession of firearms by felons. *Heller*, 554 U.S. at 626-27, 627 n.26, 635. In *Heller*, the Supreme Court parsed the text of the Second Amendment and incorporated into its holding the recognition that the plaintiff would be entitled to keep a handgun in his home

12

"[a]ssuming that [he] is not disqualified from the exercise of Second Amendment rights," *id.* at 635. The defendant, by contrast, is a felon and therefore is "disqualified from the exercise of Second Amendment rights." *Id.*; *see also id.* at 631 (explaining that the District of Columbia had "apparently" used the word "disqualified" to "mean if [the plaintiff] is not a felon and is not insane").

The Second Circuit has recognized the same limitation on the Second Amendment's scope in the context of challenges to other regulations: "As to the first step of the analysis, we have interpreted the core Second Amendment right identified in *Heller* to be the 'right of *law-abiding, responsible citizens*.'" *Libertarian Party of Erie Cty. v. Cuomo*, 970 F.3d 106, 127 (2d Cir. 2020) (quoting *Jimenez*, 895 F.3d at 234; emphasis in *Jimenez*); *accord, e.g.*, *United States v. Decastro*, 682 F.3d 160, 166 (2d Cir. 2012) (framing inquiry as whether and to what extent challenged prohibition burdens "the ability of *law-abiding citizens* to possess and use a firearm for self-defense (or for other lawful purposes)" (emphasis added)). And in *Bogle*, of course, the Second Circuit rejected a facial challenge to Section 922(g)(1) based upon *Heller*'s and *McDonald*'s reassurances grounded in history. Laws such as Section 922(g)(1) are therefore constitutional under the Second Amendment's text as informed by a variety of "historical justifications," *Heller*, 554 U.S. at 635.

### 2. Historical Tradition Confirms that Section 922(g)(1) Is Consistent with This Nation's Historical Tradition of Firearms Regulation

A comprehensive review of "this Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2126, confirms the validity of laws disarming people because of felony convictions, whether or not the felonies were violent. Beginning in England and lasting at least through the founding era, history is replete with "representative historical analogue[s]" for Section 922(g)(1) that shed light on the scope of the Second Amendment and the power of legislatures. *Id.*

at 2133-34 (emphasis omitted). Two types of historical laws are particularly pertinent: (a) laws categorically disqualifying groups from possessing firearms based on a judgment that the group could not be trusted to adhere to the rule of law; and (b) laws authorizing capital punishment and estate forfeiture for felonies.

### a. Firearm Disqualification Laws

By the time of the Second Amendment's ratification in 1791, there was a robust tradition of legislatures exercising broad "discretion to disqualify categories of people from possessing firearms to address a threat purportedly posed by these people to an orderly society and compliance with its legal norms." *Jackson*, 69 F.4th at 503 (quotation marks omitted). Compelling evidence from the constitutional ratification debates confirms that in light of this longstanding tradition of analogous regulation, the founders also understood that the precise type of regulation at issue in this case is constitutional: a legislature would not, in the founders' view, infringe the right to bear arms by "disarming the people ... for crimes committed." *See infra* pp. 29-30 (quotation marks omitted) (discussing Pennsylvania Antifederalists' proposal in 1787).

*England.* Because the Second Amendment "codified a right inherited from our English ancestors," English legal tradition sheds light on the scope of the "right secured by the Second Amendment"—which, as with the English right, "is not unlimited." *Bruen*, 142 S. Ct. at 2127-28 (quoting *Heller*, 554 U.S. at 599, 626). Among the limits well-established in England was the authority to disarm classes of people who, in the legislature's view, could not be depended upon to obey the rule of law. In 1689, for example, the government passed an "Act for the better secureing the Government by disarming Papists and reputed Papists," which provided that any Catholic who refused to make a declaration renouncing his or her faith could not "have or keepe in his House or elsewhere" any "Arms[,] Weapons[,] Gunpowder[,] or Ammunition (other than such necessary Weapons as shall be allowed to him by Order of the Justices of the Peace ... for the

defence of his House or person).” 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71-73 (1688).[3] Enacted shortly after the Glorious Revolution of 1688—when the Protestants King William and Queen Mary succeeded the Catholic King James II—this statute reflected the new government’s perception that Catholics who refused to renounce their faith were among “those who are unwilling to obey the government and its laws.” *Jackson*, 69 F.4th at 502 (quotation marks omitted).

This example is particularly relevant because the same Parliament “wr[ote] the ‘predecessor to our Second Amendment’ into the 1689 English Bill of Rights,” which similarly drew a religion-based distinction, among other limitations. *Bruen*, 142 S. Ct. at 2141 (quoting *Heller*, 554 U.S. at 593). That predecessor specified that “Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law.” 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* 143 (1688). “Englishmen had never before claimed the right of the individual to arms.” *Bruen*, 142 S. Ct. at 2142 (alteration and quotation marks omitted). And when they first formally claimed that right, the English ensured that the government retained the power—which it in fact exercised—to disarm a class of the population based on concerns that the members of that class had failed to demonstrate that they would abide by the law.

*Colonial America.* The American colonies inherited the English tradition of broad legislative authority to disarm classes of people who were viewed as untrustworthy or dangerous. Firearm regulations directed toward disarming Native Americans and Black people were

---

[3] Though the statutory compilation identifies this as a 1688 act, it was enacted in 1689. *See* 14 *Journals of the House of Lords 1685-1691*, at 208-09 (1767-1830) (reflecting enactment on May 11, 1689); *Bill of Rights [1688]*, https://www.legislation.gov.uk/aep/WillandMarSess2/1/2 (explaining that “[i]t appears that all the Acts of” the first Parliament of William and Mary “were treated as being Acts of 1688” in official sources under an “old method of reckoning”—including the English Bill of Rights, discussed below, which was similarly enacted in 1689).

pervasive.[4] Other colonial laws "followed longstanding English practice" by disarming Catholics

who refused to take an oath of allegiance. *United States v. Perez*, 6 F.4th 448, 462 (2d Cir. 2021)

(Menashi, J., concurring in the judgment) (citing Virginia law); *see also* Joseph G.S. Greenlee,

*The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo.

L. Rev. 249, 263 (2020) (citing Maryland, Virginia, and Pennsylvania laws). While these specific

"categorical prohibitions of course would be impermissible today under other constitutional

provisions, they are relevant here in determining the historical understanding of the right to keep

and bear arms." *Jackson*, 69 F.4th at 503.

　　*The Revolutionary War.* Over the course of the Revolutionary War, American legislatures

passed numerous laws disarming certain individuals who failed to demonstrate loyalty to the

emergent American government. *Id.* at 503. An early example is a 1775 Connecticut law providing

that any person convicted of "libel[ing] or defam[ing]" any acts or resolves of the Continental

---

[4] *See* Saul Cornell, A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America 28-29 (2006); *see also, e.g., Laws and Ordinances of New Netherland*, 1638-1674, at 18-19 (1868) (1639 New Netherland law); 1 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 255-56 (1823) (1643 Va. law); 5 *Records of the Colony of New Plymouth* 173 (1856) (1675 Plymouth law); 2 *Records of the Colony of Rhode Island and Providence Plantations* 561 (1857) (1677 R.I. law); 2 *The Statutes at Large; Being a Collection of All the Laws of Virginia* 481-82 (1823) (1680 Va. law); *Grants, Concessions, and Original Constitutions of the Province of New Jersey: The Acts Passed During the Proprietary Governments, and Other Material Transactions Before the Surrender Thereof to Queen Anne* 341 (1753) (1694 N.J. law); 2 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 235 (1896) (1706 Pa. law); 1 *The Laws of Maryland, With the Charter, the Bill of Rights, the Constitution of the State, and Its Alterations, the Declaration of Independence, and the Constitution of the United States, and Its Amendments* 117-18 (1811) (1715 Md. Law); 6 *The Public Records of the Colony of Connecticut* 381-82 (1872) (1723 Conn. law); *Laws of New York From the Year 1691 to 1773*, at 199 (1752) (1730 N.Y. Law); *A Complete Revisal of All the Acts of Assembly, of the Province of North-Carolina, Now in Force and Use* 152-54 (1773) (1753 N.C. law); 6 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 319-20 (1899) (1763 Pa. law); *Digest of the Laws of the State of Georgia from Its First Establishment as a British Province Down to the Year 1798, Inclusive, and the Principal Acts of 1799*, at 153-55 (1800) (1768 Ga. Law).

Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 1993 (1890) (1775 Conn. law). In 1776, the Continental Congress recommended that the colonial governments disarm those who were "notoriously disaffected to the cause of America" or who simply "have not associated" with the colonial governments in the war effort. 4 *Journals of the Continental Congress 1774-1789*, at 205 (1906) (resolution of March 14, 1776). At least six of the governments enacted legislation in this vein. *See* 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479-84 (1886) (1776 Mass. law); 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. law); 1 *The Public Acts of the General Assembly of North Carolina* 231 (1804) (1777 N.C. law); *Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777) (1777 N.J. law); 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112-13 (1903) (1777 Pa. law); 9 *The Statutes at Large; Being a Collection of All the Laws of Virginia* 282 (1821) (1777 Va. law). These disarmament measures adopted during this early period of the Republic reflect that "legislatures traditionally possessed discretion to disqualify categories of people from possessing firearms to address a threat purportedly posed by these people." *Jackson*, 69 F.4th at 503.

Another Court in this District recently relied upon these English, colonial, and Revolutionary War-era precedents in upholding the constitutionality of 18 U.S.C. § 922(n) (prohibiting receipt of firearms while under felony indictment):

> It goes without saying that, in our modem era, a law that would disarm a group based on race, nationality, or political point of view—or on the assumption that these characteristics bespoke heightened dangerousness—would be anathema, and clearly unconstitutional. *See Drummond v. Robinson Twp.*, 9 F.4th 217, 228 n.8 (3d

Cir. 2021) (discussing such laws). But the Second Amendment's inquiry into historical analogues is not a normative one. Viewing these laws in combination, the above historical laws bespeak a "public understanding of the [Second Amendment] right" in the period leading up to 1791 as permitting the denial of access to firearms to categories of persons based on their perceived dangerousness. *Bruen* and *Heller* recognized one such longstanding classification—on gun possession by felons. *See Bruen*, 142 S. Ct. at 2137; *Heller*, 553 U.S. at 627; *see also Medina*, 913 F.3d at 159 (collecting cases evidencing that the scope of the Second Amendment was understood to permit the exclusion of dangerous categories of persons). And courts have recognized, based on historical evidence, the common law tradition of disarming classes of individuals based on judgments about whether they were "peaceable" or "law-abiding."

*United States v. Rowson*, 2023 WL 431037, at *22 (S.D.N.Y. Jan. 26, 2023).

***Ratification debates.*** The historical background of the Second Amendment's adoption provides particularly persuasive evidence that the founders understood that the constitutional right to bear arms is compatible with broad legislative authority to disarm groups legislatures did not trust to follow the law. One "Second Amendment precursor[]" that the Supreme Court has described as "highly influential," *Heller*, 554 U.S. at 604, is particularly instructive. When the Pennsylvania ratifying convention met in 1787, one of the "main issues throughout the ... debate" was the Antifederalists' objection to the Constitution's "lack of a Bill of Rights." 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627 (1971). Although the Antifederalists did not persuade a majority of the convention to reject ratification on this basis, their principal objections were ultimately vindicated four years later through the adoption of the Bill of Rights, eight provisions of which—including the Second Amendment—echoed a set of amendments first proposed by the Pennsylvania Antifederalists. *Id.* at 628 (explaining that these specific proposals are "of great importance in the history of the federal Bill of Rights"). And the Pennsylvania Antifederalists' proposed constitutional amendment regarding the right to bear arms stated that: "no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals." *Id.* at 665 (emphasis added). Thus, the founding

generation recognized that both "crimes committed" and "real danger of public injury" can independently supply grounds for a legislature to prohibit firearm possession.

The Pennsylvania Antifederalists were not alone in proposing a Second Amendment precursor that expressly permitted laws disarming untrustworthy people. At the Massachusetts convention, Samuel Adams proposed an amendment providing that the "Constitution be never construed to authorize Congress ... to prevent the people of the United States, *who are peaceable citizens*, from keeping their own arms." *Id.* at 675, 681 (emphasis added) (quotation marks omitted). And in New Hampshire, the convention recommended an amendment providing that "Congress shall never disarm any Citizen unless such as are or have been in *Actual Rebellion*." *Id.* at 758, 761 (emphasis added).

The Second Amendment as adopted does not include the same language as these proposals. But it would have been "obvious" to the founders that certain groups, including (but not necessarily limited to) "the felon," Cooley, *supra*, at 29, could properly be subject to disarmament laws consistent with the "*pre-existing* right" that was "codified" in the Second Amendment, *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 592). *See also* Amar, *supra*, at 48; Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (explaining that founding-era proponents of a constitutional right to bear arms "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because this limitation "was understood"). Given the language of these influential proposals along with the apparent absence of any meaningful founding-era "disputes regarding the lawfulness" of potential regulations disarming criminals, courts "can assume it settled" that such regulations are "consistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2133 (discussing the proper inference to draw from the historical record

regarding "sensitive places," which "yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited").

Each regulation discussed above demonstrates that the founders inherited a tradition under which a legislature has broad discretion to disarm classes of people they did not trust to follow the law. And, collectively, the effect was that only a subset of the founding generation would have "fully enjoyed the right to keep and bear arms." Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* 116 (2011) (explaining that the founders "were perfectly willing to confiscate weapons from anyone deemed untrustworthy").

### b. Felony Punishment Laws

In a separate vein, for centuries, felonies have been "the most serious category of crime." *Medina*, 913 F.3d at 158. In 1769, Blackstone defined a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded, according to the degree of guilt." 4 William Blackstone, *Commentaries on the Laws of England* 95 (1769). Blackstone observed that "[t]he idea of felony is indeed so generally connected with that of capital punishment, that we find it hard to separate them." *Id.* at 98.

Capital punishment and forfeiture of estate were also commonly authorized punishments in the American colonies (and then the states) up to the time of the founding. *Folajtar v. Attorney General*, 980 F.3d 897, 904-05 (3d Cir. 2020). Capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and was "'the standard penalty for all serious crimes.'" *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., joined by Scalia, J., concurring in the judgment) (quoting Stuart Banner, *The Death Penalty: An American History* 23 (2002)). Indeed, the First Congress (which drafted and proposed the Second Amendment) made a variety of felonies punishable by death, including not only offenses like treason, murder on federal land, and piracy on the high seas,

but also non-violent conduct relating to forging or counterfeiting a public security. *See* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112-15 (1790). States in the early Republic likewise treated "nonviolent crimes such as forgery and horse theft" as "capital offenses." *Medina*, 913 F.3d at 159; *see* Banner, *supra*, at 18 (referring to specific examples of individuals in Georgia who "escaped from jail after being condemned to death" for "forgery" or "horse-stealing"). And many American jurisdictions up through the end of the 1700s authorized complete forfeiture of a felon's estate. *See* Beth A. Colgan, *Reviving the Excessive Fines Clause*, 102 Cal. L. Rev. 277, 332 & nn.275-76 (2014) (citing statutes).

As the D.C. Circuit has observed, "it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms." *Medina*, 913 F.3d at 158; *accord Jackson*, 69 F.4th at 503 (explaining "[e]arly legislatures ... authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for non-violent offenses involving deceit and wrongful taking of property" and agreeing with *Medina*). Thus, "tradition and history" show that "those convicted of felonies are not among those entitled to possess arms" under the Second Amendment. *Medina*, 913 F.3d at 158, 160.

\* \* \*

Both sets of historical traditions surveyed above demonstrate Section 922(g)(1)'s constitutionality. *Bruen* calls for an analysis of "how and why" the historical and challenged regulations "burden a law-abiding citizen's right to armed self-defense." 142 S. Ct. at 2133. Of course, Section 922(g)(1) imposes *no* burden on "a law-abiding citizen's right to armed self-defense" because it only applies to people who have removed themselves from the law-abiding citizenry by committing offenses punishable by more than one year of imprisonment. In any event,

what the historical record shows is that legislatures historically disqualified categories of persons from possessing firearms, just as felon-dispossession statutes do today. History shows that legislatures' reasons for doing so could include a legislative judgment that the disarmed persons could not be counted upon to be responsible, law-abiding members of the polity, just as felon-dispossession statutes do today. And history demonstrates that people who committed felonies at the time of the founding would have been exposed to far more severe consequences than disarmament including capital punishment and estate forfeiture.

## **CONCLUSION**

For the foregoing reasons, the defendant's motion should be denied.

Dated: July 19, 2023
      White Plains, New York

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: /s/ Stephanie Simon
      Stephanie Simon
      Assistant United States Attorney
      (212) 637-2581